[No. B162758. Second Dist., Div. Five. Jan. 29, 2004.]

MICHAEL A. O'FLAHERTY et al., Cross-complainants and Appellants, v. STEPHEN L. BELGUM et al., Cross-defendants and Respondents.

**Counsel**

Brown & Kellner, Michael R. Brown and Richard L. Kellner for Cross-complainants and Appellants.

Ernest C. Chen for Cross-defendants and Respondents O'Flaherty & Belgum, Stephen L. Belgum and Marie Belgum.

Dawn S. Theodora for Cross-defendant and Respondent Todd C. Theodora.

**Opinion**

**MOSK, J.**—Appellants Michael A. O'Flaherty, John J. Weber, Lee T. Thies, Robert M. Dato, Lisa A. Cross, Mike Martinez, Lynn E. Ovando, and Gregory M. Hatton (collectively the withdrawing partners), the law firm of O'Flaherty, Cross, Martinez, Ovando & Hatton LLP (OCMOH), and the law firm of O'Flaherty, Cross, Martinez & Ovando LLP (OCMO) appeal against a judgment confirming an arbitration award in favor of their former partners (sometimes collectively the remaining partners) and former law firm O'Flaherty & Belgum (OB) in this matter concerning the withdrawal of the partners, dissolution of the partnership, and the appointment of a receiver for OB. Stephen L. Belgum (Belgum), his former wife Marie Belgum, and OB are the respondents.

Appellants contend as follows: (1) the arbitrator exceeded his powers by adjudicating claims that were instituted by Belgum's attorney on behalf of OB over the objection of the receiver when such claims could be prosecuted only in the receiver's name; (2) the arbitrator exceeded his powers by finding that the withdrawing partners had forfeited their interests in OB and that no accounting of their capital accounts was required; (3) the award should have been vacated based on the arbitrator's failure to disclose he had been represented in two matters by the law firm that represented appellants during part of the arbitration proceedings; (4) the arbitrator failed to disclose circumstances concerning his separation against a former law firm that could cause a reasonable person to doubt his ability to be impartial; (5) the trial court abused its discretion by denying discovery requests concerning the arbitrator's separation against the law firm; and (6) due process requires judicial review of the punitive damages award.

We hold that because the arbitration clause in the partnership agreement expressly precluded the arbitrator against granting any remedy prohibited by the agreement or "not available in a court of law," the arbitrator exceeded his authority by declaring a forfeiture of the withdrawing partners' capital accounts. We further hold that the arbitrator had no jurisdiction over OB in view of the objection of the receiver. We reverse the judgment and order that the award be vacated.

## FACTS AND PROCEDURAL BACKGROUND

OB was a law partnership, the equity partners being Belgum, O'Flaherty, Weber, Hatton, Thies, Dato, Cross, Ovando, Martinez, Todd Theodora, Ernest Chen, and Nancy Wanski. The partners had a dispute leading to O'Flaherty, Cross, Martinez, Ovando, Hatton, Weber, Thies and Dato withdrawing against OB and forming a new law partnership (OCMOH).

On January 12, 1998, Wanski filed an action (Los Angeles Superior Court Case No. BC184060—the Wanski action) against the withdrawing partners and OCMOH for breach of contract, intentional violation of fiduciary duty, conversion, appointment of an impartial receiver, an accounting, and judicial dissolution of OB. The withdrawing partners filed a cross-complaint against the remaining partners of OB for declaratory relief and appointment of a receiver, while reserving their right to arbitration.

The withdrawing partners stated that the disputes between the parties included the following: who was the managing partner; whether Belgum had been expelled; whether OB was properly dissolved effective December 31, 1997; and issues concerning the use of OB's offices and property. They also stated that, "A receiver should be appointed by the court to hold the

Partnership's property and wind up the Partnership's affairs while the disputes between the parties are being resolved in order to preserve the Partnership's value and insure the effect of any arbitration award and resulting judgment specifying how the Partnership should be wound up and liquidated."

On January 21, 1998, the superior court in the Wanski action found that a receiver was necessary and appointed David Ray to act as the receiver for OB (hereafter, we will refer to the court in that action—the Wanski action—as the receivership court with respect to matters pertaining to the OB receivership and as the trial court with respect to matters dealing with the litigation or the arbitration).[1] The receiver's powers included enforcing and collecting debts, instituting lawsuits on behalf of OB to preserve and protect the partnership's assets, discharging obligations of OB against the funds in his possession, and engaging the services of counsel.

The receivership court confirmed the receiver's appointment on February 10, 1998. On February 25, 1998, Belgum filed a motion for an order discharging the receiver and terminating the receivership on the grounds that OB had not been dissolved and that no receiver was required to manage the assets. Belgum argued that because no dissolution had been effected, there was no entitlement to a receivership for dissolution purposes. In addition, Belgum argued that the withdrawing partners had violated the partnership agreement, and that therefore, their interests in OB's assets were limited to the return of their capital accounts. Wanski joined in Belgum's motion, and Chen filed a nonopposition. The receivership court denied the motion to discharge the receiver and ordered as follows: (1) the receiver should request an accounting of net profits against OCMOH for OB clients against the time of dissolution; (2) the receiver should execute substitution of attorneys for OB clients; (3) OCMOH's claim to payments for work on OB cases should be treated as any other claim that will await final disposition through the arbitration process; (4) the receiver should pay for services provided to OB by OCMOH; and (5) the receiver should pursue collection of rent against former OB partners using and occupying receivership property.

On May 26, 1998, the withdrawing partners filed a petition in the Wanski action for an order staying the Wanski action and compelling arbitration pursuant to an arbitration clause in the partnership agreement. Section 20.1 of the partnership agreement provided for arbitration of disputes as follows: "Except as otherwise provided in this Agreement, any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled by mediation, or by arbitration before a single arbitrator in Los Angeles, California." In addition, section 20.5 provided: "Each of the parties

---

[1] We refer to facts concerning the receivership proceeding that are in the record and that may bear on the appealed-against judgment that confirmed the arbitration award.

reserves the right to file with a court of competent jurisdiction an application for temporary or preliminary injunctive relief, writ of attachment, writ of possession, temporary protective order and/or appointment of a receiver on the grounds that the arbitration award to which the applicant may be entitled may be rendered ineffectual in the absence of such relief." Section 20.9 provided: "The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement . . . or not available in a court of law." Section 20.11 provided: "The costs of the arbitration . . . shall be borne equally by the parties to the arbitration. Attorneys' fees may be awarded to the prevailing or most prevailing [party] at the discretion of the arbitrator."

The withdrawing partners stated in their petition for arbitration that the disputed issues included whether Belgum was properly involuntarily terminated for cause; whether OB was properly dissolved by a vote of the majority in interest effective December 31, 1997; whether Belgum's consent was required to dissolve OB; and whether the withdrawing partners were obligated to account to the remaining partners for profits earned in connection with completing OB client matters after December 31, 1997. The withdrawing partners requested that the trial court order the remaining partners to arbitration and that the receivership court retain jurisdiction over the receiver and the receivership estate. On July 30, 1998, the trial court granted the petition and dismissed the action, but retained jurisdiction to enforce the arbitration award and jurisdiction over the actions of the receiver and the receivership estate. The court later amended the order to provide that the matter was stayed pending arbitration.

On December 17, 1998, Attorney Steven Morgan (Attorney Morgan) filed a complaint on behalf of Belgum and OB against the withdrawing partners and OCMOH for breach of written contract, intentional breach of fiduciary duty, conversion, defamation, intentional interference with contracts, and intentional interference with economic advantage (Los Angeles Superior Court Case No. EC026142—the Belgum action). Belgum filed a motion to vacate the dismissal of the Wanski action and restore it to the active calendar for failure to institute arbitration proceedings. The withdrawing partners stated that they had not instituted arbitration proceedings because their claims to shares of the net assets after liquidation could be litigated in the receivership proceeding. The withdrawing partners argued it was the responsibility of the remaining partners to institute arbitration proceedings to pursue other claims. The trial court set an order to show cause why the stay should not be dissolved for failure to arbitrate.

On March 30, 1999, the withdrawing partners sent a demand for arbitration to the remaining partners in accordance with the rules of the American

Arbitration Association (AAA). The demand stated that the nature of the dispute was the proper distribution of the net proceeds to the partners against the court-ordered liquidation of OB after the liquidation conducted by the court-appointed receiver had been completed. On March 30, 1999, the receiver demanded in writing that Attorney Morgan immediately cause the dismissal of OB against the Belgum action because the receiver was the only person authorized to bring a lawsuit on behalf of OB, and he did not authorize Attorney Morgan to file the Belgum action on behalf of OB.

On April 5, 1999, the withdrawing partners petitioned the trial court for an order compelling arbitration in the Belgum action. In addition, they objected to Belgum's standing to bring an action on behalf of OB and stated that the receiver had demanded that Attorney Morgan dismiss OB as a plaintiff. Attorney Morgan, on behalf of Belgum and OB, filed an opposition to the petition to compel arbitration. On April 23, 1999, the trial court granted the petition to compel arbitration and stayed the Belgum action.

On May 7, 1999, the trial court assigned the Wanski and Belgum actions (along with Los Angeles Superior Court Case No. NC025065)[2] to one court as related actions for all purposes (the Wanski case—BC184060—being the lead case). On July 19, 1999, Marie Belgum filed a complaint in intervention in the Wanski action. The trial court ordered the case to binding arbitration, stayed the case pending arbitration and retained jurisdiction to enforce the arbitration award. In September 1999, Hatton and Dato withdrew against OCMOH and went to work for separate law firms. OCMOH became O'Flaherty, Cross, Martinez and Ovando (OCMO). On November 18, 1999, Attorney Morgan, on behalf of Belgum, OB, and Marie Belgum, filed a counterdemand for arbitration with the AAA. The counterdemand stated that the nature of the dispute included determination of the causes of action alleged in the complaint in the Belgum action and the complaint in intervention; the respective interests of each partner or former partner; the effect of the withdrawing partners' acts; the amounts owed by the withdrawing partners as a result of their acts; the amounts owed to OB for expenses and losses incurred by OB as a result of placing and maintaining OB in receivership; the amounts owed to OB by any withdrawing partner under the partnership agreement; the amounts owed to OB by the withdrawing partners for diminution in value of OB's accounts receivable and other assets; the liability and amounts owed to Theodora as a result of Theodora's voluntary withdrawal; all claims made by the withdrawing partners and OCMOH against OB in the receivership claims procedure; the amounts owed to Belgum, OB, and Marie Belgum for attorney fees, costs, and arbitration fees; whether OB was dissolved by the acts of the withdrawing partners; and the current status of OB. Belgum, OB, and Marie Belgum sought an order determining

---

[2] There is no discussion or identification in the record of Case No. NC025065.

the issues, compelling payments owed to them, and directing distribution of OB's assets currently in the possession and control of the receiver. Theodora also filed a counterdemand for arbitration.

The liability phase of the arbitration commenced on November 13, 2000, and was held during various periods between November 2000 and March 2001. The receiver sent a letter by fax to the withdrawing partners' attorney stating that the receiver was the only authorized representative of OB and that he had not retained or authorized anyone to represent OB or the receiver in the arbitration proceeding, because neither were proper parties to the litigation. The receiver's position was that under the court order the partners were to complete arbitration of all disputes between the partners and not matters concerning the receiver. The withdrawing partners transmitted the letter to the arbitrator and also objected to Attorney Morgan's representation of OB. Attorney Morgan purported to represent OB in connection with the arbitration proceeding.

On April 7, 2001, the arbitrator issued the following interim findings of liability: the withdrawing partners were jointly and severally liable to Belgum for damages resulting against breach of contract and breach of their fiduciary duty; the withdrawing partners were jointly and severally liable to OB for damages resulting against breach of their fiduciary duty to OB, including expenses OB incurred because of the receivership imposed by the trial court; the withdrawing partners, OCMOH, and OCMO were liable to Belgum for damages resulting against intentional interference with OB's business relations; the withdrawing partners, OCMOH, and OCMO were liable to OB for damages resulting against conversion of OB's property; O'Flaherty, Hatton, and Weber were liable to Belgum for punitive damages for their breach of fiduciary duty toward Belgum; the withdrawing partners, Wanski and Chen were separately liable to OB for the negative balances of their respective capital accounts as determined pursuant to the partnership agreement; Hatton was liable to OB for the amount spent to defend and settle an employee's claim against Hatton; OB was not dissolved on December 26, 1997; and the dissolution date remained to be resolved in the second phase of the arbitration.

On June 6, 2001, the receiver advised the arbitrator that he, the receiver, had not authorized anyone to take part in the arbitration on behalf of OB, and the person who had purportedly made an appearance for OB was not authorized to do so. The receiver requested that the arbitrator strike the counterclaims in OB's name against the order. On July 12, 2001, the receiver filed a motion with the receivership court for instructions concerning how to proceed with the interim arbitration award in favor of OB and the second phase of the arbitration. A hearing was held on June 12, 2001, in the

receivership court, at which hearing the receivership court instructed the receiver not to participate and to allow the arbitration to proceed as it had been proceeding.

Hearings on the bifurcated remedy phase of the arbitration concluded on August 28, 2001. The arbitrator in his final award made a number of findings, concluding that the withdrawing partners lacked the authority to do what they did, breached their contractual and fiduciary duties to the remaining partners, made false representations to the receiver, and appropriated assets of OB. The arbitrator found that the resolutions of the withdrawing partners were "ineffectual" and that because of the withdrawing partners' breaches of their contractual and fiduciary duties, the withdrawing partners "forfeited all rights under the Partnership Agreement no later than December 31, 1997," rendering "unnecessary any calculations regarding the capital accounts of O'Flaherty & Belgum as of December 31, 1997 or later."[3] The arbitrator awarded OB $561,891 for breach of fiduciary duties against the withdrawing partners; $1,566,733 for intentional interference with OB's business relations against the withdrawing partners, OCMOH, and OCMO; $426,757 for conversion against the withdrawing partners, OCMOH, and OCMO; $27,065 for reimbursement of legal expenses against Hatton; and $45,701 for legal fees against Belgum and Marie Belgum. The arbitrator awarded Belgum and Marie Belgum $2,738,554 for breach of fiduciary duties against the withdrawing partners. The arbitrator awarded Belgum the following sums as punitive damages: $1,177,991 against O'Flaherty; $75,000 against Weber; and $50,000 against Hatton. The arbitrator awarded Theodora $123,502 for deferred compensation and interest. The arbitrator awarded the following sums for attorney fees and costs to be paid by the withdrawing partners, OCMOH, and OCMO: $544,876 to Belgum, including $180,182 for Attorney Morgan's services performed and costs incurred on behalf of Belgum; $79,530 to Marie Belgum; $16,577 to Theodora; and $143,000 to OB for Attorney Morgan's services performed and costs incurred on OB's behalf. He also awarded Theodora $16,577 for attorney fees and costs against OB. He ordered the withdrawing partners, OCMOH, and OCMO to pay the administrative fees and expenses of the AAA and the arbitrator. In addition, he ordered the withdrawing partners, OCMOH, and OCMO to pay the following sums in reimbursement of advances made to the AAA: $153,055.60 to OB in reimbursement of amounts advanced on its behalf by the receiver; $4,153.33 to Theodora; and $1,850 to Belgum. He found Chen and Belgum were the duly elected liquidating administrators of OB and ordered the balance of the funds held by the receiver to be disbursed to the liquidating administrators.

---

[3] The arbitrator said that December 31, 1997 was the date of withdrawal of the withdrawing partners and that the date of dissolution was July 31, 1998.

On October 9, 2001, Belgum, Marie Belgum, Chen, and Theodora filed a petition for confirmation of the arbitration award. Attorney Morgan filed a joinder on behalf of OB. Hatton and Dato filed a petition to vacate the arbitration award. Weber, Cross, Martinez, Ovando, Thies, Dato and OCMO filed a petition to vacate the award, as did O'Flaherty. The petitions to vacate raised issues concerning the lack of disclosure by the arbitrator and that the arbitrator exceeded his power. The trial court refused to vacate the award and confirmed it. There were motions for discovery and for reconsideration dealing with disclosure issues and punitive damages. On August 29, 2002, the trial court issued an order denying the motions for reconsideration concerning the punitive damages award. On the motion for reconsideration based on newly discovered evidence, the trial court found that even if reconsideration were granted, the admissible evidence did not persuade the trial court to change its decision. Therefore, the trial court granted the motion for reconsideration, but reaffirmed its original decision.

On May 15, 2002, a hearing was held on the motion to terminate the receivership and to surcharge the receiver in his personal capacity. The receivership court granted the motion to terminate the receivership and continued the motion to surcharge the receiver.

After a hearing on September 23, 2002, the receivership court found that the receiver at all times acted in good faith, reasonably pursuant to the terms of the order appointing him, and in accordance with the instructions given with respect to specific actions where there were motions for instructions filed. The motion to surcharge the receiver was denied. The receivership court also approved the final accounting and report.

In connection with whether Attorney Morgan had been authorized to represent OB, the receivership court said: "I am not going to at this point now say the receiver couldn't do what he did. I'm not going to say one way or another. That's now going to be for the Court of Appeals to decide." The receivership court stated that it was not going to issue a nunc pro tunc order approving Attorney Morgan's representation of OB, as the receivership court did not find that appropriate. The withdrawing partners noted that the order appointing the receiver gave him the right to institute actions on behalf of the receivership estate. The receivership court replied: "But he didn't and hasn't and when he wanted to, I told him not to. [¶] [Attorney for the withdrawing partners]: Exactly. But the point [is], that was your decision to make with respect to the receivership and not for Mr. Morgan to come in sua sponte and say, I am representing [OB], and therefore, I am the one who should prosecute this case where there is no authority, and Your Honor—[¶] [The Court]: You can argue that to the Court of Appeals when you seek to reverse the arbitration decision. I'm not going to rule on that. [¶] [Attorney for the

withdrawing partners]: You're not ruling whether or not he had authority or not? [¶] [The Court]: I'm not ruling one way or another on that. That's really not an issue before me."

The withdrawing partners asked for clarification as to whether the receivership court was ruling that it did not have power to make a nunc pro tunc order. The receivership court replied: "I'm saying there's no power because I don't see any, really, basis for it. Just because I have jurisdiction over a receiver, I don't think I can go back and make all kinds of orders, number one. [¶] Number 2, in terms of equity and what is before me, . . . I am not going to do it as a matter of discretion as well. [¶] So even if I had power and it was a question of discretion, I wouldn't do it. [¶] [Attorney for the withdrawing partners]: You would not approve the appointment of—[¶] [The Court]: I would not approve or disapprove. I think it is for the arbitrator to decide, and if I really had to do it, I probably would approve. [¶] . . . I'm telling you I'm not doing it because it's not before me in any case." The following colloquy concerning the propriety of Attorney Morgan's purporting to represent the partnership also occurred: "[The Court]: Well, did anyone go to the arbitrator and make a motion to that effect? [¶] [Attorney of withdrawing partners]: Yes, Your Honor. [¶] [The Court]: Then, in that case, it's in the record, and the Court of Appeal will review it, and the Court of Appeal will deal with it.

On October 8, 2002, the receivership court entered its order denying the motion to surcharge the receiver and granting the motion to terminate the receivership proceeding. The receivership court noted that the arbitration award had been entered and provided for liquidating administrators. The receivership court approved the receiver's final account. The receivership court directed the receiver to wind up the administration of the receivership proceedings, including turning over all files to the liquidating administrators.

On September 25, 2002, the trial court entered judgment on the arbitration award as follows: "1. [Belgum and Marie Belgum recover against O'Flaherty, Weber, Hatton, Theis, Dato, Cross, Ovando, and Martinez,] jointly and severally, the sum of [$2,738,554]; [¶] 2. [OB recover against O'Flaherty, Weber, Hatton, Theis, Dato, Cross, Ovando, and Martinez], jointly and severally, the sum of [$2,555,381], [$142,000] as attorneys' fees, and [$154,055.60] as costs, totaling [$2,851,436.60]; [¶] 3. [Belgum] recovers as punitive damages: [¶] a. against [O'Flaherty] the sum of [$1,177,991]; [¶] b. against [Weber] the sum of [$75,000]; and [¶] c. against [Hatton] the sum of [$50,000]; [¶] 4. [OB recovers] against [Hatton] the sum of [$27,065]; [¶] 5. [OB recovers] against [Belgum and Marie Belgum] the sum of [$45,701]; [¶] 6. [Theodora recovers] against [OB] the sum of [$101,508.23] and interest at 10 percent per annum to August 1, 2001, in the amount of [$21,993.45], for a

total recovery of [$123,502]; [¶] 7. [Belgum recovers] against [O'Flaherty, Weber, Hatton, Theis, Dato, Cross, Ovando, and Martinez, and OCMOH and OCMO], jointly and severally, the sum of [$503,965] as attorneys' fees and [$42,781] as costs, totaling [$546,746]; [¶] 8. [Marie Belgum recovers] against [O'Flaherty, Weber, Hatton, Theis, Dato, Cross, Ovando, and Martinez, and OCMOH and OCMO], jointly and severally, the sum of [$77,125] as attorneys' fees and [$2,405] as costs, totaling [$79,530]; [¶] 9. [Theodora recovers] against [O'Flaherty, Weber, Hatton, Theis, Dato, Cross, Ovando, and Martinez, and OCMOH and OCMO], jointly and severally, the sum of [$11,350] as attorneys' fees and [$9,380.33] as costs, totaling [$20,730.33]; [¶] 10. [Theodora recovers] against [OB] the sum of [$11,350] as attorneys' fees and [$5,227] as costs, totaling [$16,577]; [¶] 11. Pre-judgment interest is awarded at ten percent (10%) per annum against September 24, 2001[,] until the date of entry of the judgment; and [¶] 12. All sums awarded herein shall bear interest at the rate of ten percent (10%) per annum until paid in full. [¶] 13. The Award, attached hereto as Exhibit 'A,' is incorporated by reference. [¶] 14. Prevailing parties, who are [Belgum, Marie Belgum, OB, and Theodora], shall recover their costs. [O'Flaherty, Weber, Hatton, Theis, Dato, Cross, Ovando, and Martinez, OCMOH, and OCMO] are the losing parties to this judicial proceeding."

The withdrawing partners, OCMOH, and OCMO filed a timely notice of appeal against the judgment.

## DISCUSSION

Appellants have raised a number of issues. We discuss only the award of a forfeiture of capital accounts and jurisdiction by the arbitrator over a partnership in receivership over the objection of the receiver. Because we hold that the arbitrator exceeded his powers with respect to these two matters, we do not reach the other issues.

### 1. *Powers of Arbitrator and Standard of Review*

Code of Civil Procedure section 1286.2 provides that a court *shall* vacate an award if it determines "[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (*Id.*, at subd. (a)(4).) "An Arbitrator exceeds his powers when he acts without subject matter jurisdiction (*National Union Fire Ins. Co. v. Stites Prof. Law Corp.* (1991) 235 Cal.App.3d 1718, 1724 [1 Cal.Rptr.2d 570]), decides an issue that was not submitted to arbitration (*California Faculty Assn. v. Superior Court* (1998) 63 Cal.App.4th 935, 952 [75 Cal.Rptr.2d 1]; *Pacific Crown Distributors v. Brotherhood of Teamsters* (1986) 183 Cal.App.3d 1138, 1143 [228 Cal.Rptr. 645]), arbitrarily remakes

the contract (*Pacific Gas & Electric Co. v. Superior Court* (1993) 15 Cal.App.4th 576, 590 [19 Cal.Rptr.2d 295]), upholds an illegal contract (*Loving & Evans v. Blick* (1949) 33 Cal.2d 603, 609 [204 P.2d 23]), issues an award that violates a well-defined public policy (*City of Palo Alto v. Service Employees Internat. Union* (1999) 77 Cal.App.4th 327, 338–340 [91 Cal.Rptr.2d 500]), issues an award that violates a statutory right (*Board of Education v. Round Valley Teachers Assn.* (1996) 13 Cal.4th 269, 272 [52 Cal.Rptr.2d 115, 914 P.2d 193]), fashions a remedy that is not rationally related to the contract (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 375 [36 Cal.Rptr.2d 581, 885 P.2d 994]), or selects a remedy not authorized by law (*Marsch v. Williams* (1994) 23 Cal.App.4th 238, 248 [28 Cal.Rptr.2d 402] [appointing receiver]; *Luster v. Collins* (1993) 15 Cal.App.4th 1338, 1350 [19 Cal.Rptr.2d 215] [imposing economic sanctions to enforce award]). In other words, an arbitrator exceeds his powers when he acts in a manner not authorized by the contract or by law." (*Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 443 [123 Cal.Rptr.2d 122]; see *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 381 [36 Cal.Rptr.2d 581, 885 P.2d 994] ["arbitrators may not award remedies expressly forbidden by the arbitration agreement"].) "In determining whether an arbitrator exceeded his powers, we review the trial court's decision de novo, but we must give substantial deference to the arbitrator's own assessment of his contractual authority. (*Advanced Micro Devices, Inc. v. Intel Corp., supra,* 9 Cal.4th at p. 376, fn. 9; *Alexander v. Blue Cross of California* (2001) 88 Cal.App.4th 1082, 1087 [106 Cal.Rptr.2d 431].)" (*Jordan v. Department of Motor Vehicles, supra,* 100 Cal.App.4th at pp. 443–444.)

### 2. *Forfeiture of Partnership Capital Accounts*

The arbitrator provided for the forfeiture by the withdrawing partners of their capital accounts by stating in the award as follows: "Because of their flagrant breaches of the Partnership Agreement and breaches of fiduciary duty against their partnership (O&B) and their partners (Belgum, Chen and Wanski), O'Flaherty, Weber, Hatton, Thies, Dato, Cross, Ovando, and Martinez, and each of them, forfeited all rights under the Partnership Agreement no later than December 31, 1997. Their forfeiture renders unnecessary any calculations regarding the capital accounts of the partners O'Flaherty & Belgum as of December 31, 1997 or later." The arbitrator's specific reference to the capital accounts demonstrates that the rights forfeited were to the capital accounts. Respondents never contended otherwise. The arbitrator expressly said that he did not determine, or conduct an accounting as to, the amounts in or calculations concerning the partnership capital accounts.

Respondents did not raise any issue concerning the effect of alleged negative capital accounts until a petition for rehearing and therefore forfeited

that argument. (*Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1013 [36 Cal.Rptr.2d 40, 884 P.2d 988] [" 'It is a fundamental rule of appellate practice that an appellate court need not consider issues raised for the first time by a petition for rehearing.' "]; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [76 Cal.Rptr.2d 457]; *Smith v. Hopland Band of Pomo Indians* (2002) 95 Cal.App.4th 1, 12, fn. 11 [115 Cal.Rptr.2d 455]; *Gentis v. Safeguard Bus. Sys., Inc.* (1998) 60 Cal.App.4th 1294, 1308 [71 Cal.Rptr.2d 122].) The arbitrator did not find that all the capital accounts of the withdrawing partners were negative. Rather, he ordered that the withdrawing partners were liable for the negative balances in their respective capital accounts "as determined pursuant to the Partnership Agreement" and that no such reimbursements had been made. He did not conclude there were negative balances or that anyone was obligated to make "repayments." It is unclear how adjustments required by the partnership agreement would affect capital accounts. That the arbitrator ordered a forfeiture of capital accounts suggests there must have been something in the capital accounts to forfeit. Also, because Wanski had assigned her partnership rights to withdrawing partners, an accounting would be necessary to determine their rights in Wanski's assigned capital account.

The partnership agreement limited the arbitrator's power and authority to grant remedies by providing as follows: "<u>Power and Authority of Arbitrator</u>. The arbitrator shall not have any power to alter, amend, modify or change any terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, nor to grant any remedy which is either prohibited by the terms of this Agreement, or not available in a court of law." The forfeiture is contrary to partnership law; the partnership agreement and decisional law.

█ The partnership is governed by the 1994 Uniform Partnership Act. (Corp. Code, § 16111.) Under Corporations Code section 16807, subdivision (b), a partner "is entitled to a settlement of all partnership accounts upon winding up the partnership business. . . . The partnership shall make a distribution to a partner in an amount equal to any excess of the credits over the charges in the partner's account." A partner who "wrongfully disassociates" against the partnership is liable for damages (Corp. Code, § 16602, subd. (c)), but there is no reference to a forfeiture of an account. Among the various remedies in the Uniform Partnership Act, there is no provision for a forfeiture of a capital account.

The partnership agreement does not provide for forfeiture of a partner's capital account in the event the partner wrongfully withdraws against the firm or upon involuntary termination of a partner for cause. To the contrary, the agreement provides for a return of capital, even to a wrongfully withdrawing partner. The partnership agreement provides: "Upon an Event of Termination of a Partner, such Partner shall cease to be a Partner and shall only be entitled

to the rights and preferences provided in Article 11 through 17, as the case may be, in lieu of all other rights hereunder, and shall not be entitled to receive any other property payments or benefits whatsoever against the Partnership or the remaining Partners." The partnership agreement further provides for return of a partner's capital account upon a "Repayment Event." Repayment Event is defined as "an Event of Termination or the Dissolution of the Partnership." "Event of Termination" is defined as "singularly, the death, permanent disability, voluntary withdrawal, involuntary termination, or retirement of a Partner." Another provision of the partnership agreement provides that the "capital . . . accounts of the Partners *shall be adjusted* to the day the event of dissolution is declared to be effective to reflect profit or loss realized, as the case may be, against the date of the last accounting to the date of dissolution." (Italics added.) Thus, a forfeiture is contrary to the provisions of the partnership agreement governing the disposition of capital accounts.

California case law does not support a forfeiture of a capital account. As stated in *Staszak v. Romanik* (6th Cir. 1982) 690 F.2d 578, 585, "[n]umerous California cases, both before and after adoption of the UPA, have held that a partner whose wrong causes dissolution of a partnership does not forfeit his partnership interest, but is entitled to receive it, less the damages caused by his breach."

In *Gardner v. Shreve* (1949) 89 Cal.App.2d 804, 808 [202 P.2d 322], the court said, "If a partner or joint venturer by his wrong has caused the dissolution of the partnership or joint venture he does not forfeit all his rights, although he may become subject to damages and loss of his share in the goodwill." In *B.K.K. Co. v. Schultz* (1970) 7 Cal.App.3d 786, 797 [86 Cal.Rptr. 760], the court said, "[b]ut a breach of the partnership agreement does not necessarily result in a forfeiture of the partner's interest or deprive him of his right to an accounting. When a partner wrongfully withdraws he is entitled to the value of his interest, less the damages caused by him. [Citation.]" The *B.K.K.* court's use of the phrase "does not necessarily" does not imply that forfeitures may be appropriate. It appears clear against the context of the opinion that the court was alluding to the fact that the partnership agreement itself might include a forfeiture provision and that the trial court might properly have refused an accounting on that basis. Thus, the court said, "[d]efendant requested the trial court to make explicit findings as to the terms of the joint venture agreement, the performance of defendant under that agreement, the existence of any subsequent agreement among the parties, and the property owned by the business and the disposition of it. All those requests were refused. Without findings, this court has no way of determining whether defendant was refused an accounting on some proper factual ground, or whether it was upon some erroneous interpretation of the law." (*Id.* at p. 797.)

Cases in other jurisdictions hold that wrongdoing cannot justify forfeiture of a partnership account. (See *Hammes v. Frank* (Ind.Ct.App. 1991) 579 N.E.2d 1348, 1354; *Staszak v. Romanik, supra,* 690 F.2d 578, 585; *Dobson v. Dobson* (Tex.Ct.App. 1980) 594 S.W.2d 177, 181; *Obert v. Environmental Research and Dev. Corp.* (1989) 112 Wn.2d 323 [771 P.2d 340].) In *Meehan v. Shaughnessy,* (1989) 404 Mass. 419 [535 N.E.2d 1255], when law partners were found to have breached their fiduciary duty to their firm, the firm argued they thereby forfeited all rights to their capital contributions. The court expressly rejected that contention, holding the disloyal partners were entitled to their interest in the partnership's reserve and capital accounts and in the partnership income earned but not distributed. The court said capital contributions "are not a form of liquidated damages to which partners can resort in the event of a breach." (*Id.* at p. 1266.) And in *Thomas v. Marvin E. Jewell & Co.* (1989) 232 Neb. 261 [440 N.W.2d 437, 443], the court said "Thomas also claims the district court erred in denying Thomas an account-ing, finding his action was barred by the 'unclean hands' doctrine. Nebraska law gives a dissolving partner an absolute right to an accounting regardless of the reason for the dissolution. (Neb.Rev.Stat. § 67-343 (Reissue 1986.) Thus, even if the trial court correctly determined that the dissolution was wrongful, Thomas is entitled to an accounting and to his share of the partnership assets less any damages caused by his manner of dissolution."

There are several reasons supporting these authorities. The first is that the law abhors forfeiture. (*Deutsch v. Phillips Petroleum Co.* (1976) 56 Cal.App.3d 586, 592 [128 Cal.Rptr. 497]; *Dobson v. Dobson, supra,* 594 S.W.2d 177.) The second is that there may be no causal connection between the disloyal conduct and the forfeiture of the capital account. (*Meehan v. Shaughnessy, supra,* 535 N.E.2d at p. 1266.) The third is the "ownership interest is derived against the formation of the partnership and is not dependent upon a partner's performance of duties and obligations under the agreement." (*Chapman v. Dunnegan* (Mo.Ct.App. 1984) 665 S.W.2d 643, 648.)

The dissent discusses the application of the unclean hands doctrine. Neither the arbitrator nor the parties raised or argued the applicability of the doctrine of unclean hands. Thus, that issue has been forfeited. (*In re Aaron B.* (1996) 46 Cal.App.4th 843, 846 [54 Cal.Rptr.2d 27]; *Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1050–1055 [213 Cal.Rptr. 69]; see also, *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 [87 Cal.Rptr.2d 754] ["An appellate court is not required to examine undeveloped claims, nor to make arguments for parties"].) The arbitrator did not rule that the withdrawing partners could receive no relief because of the doctrine of unclean hands. Instead he proceeded to hear the matter and then order a forfeiture. (See *Moriarty v. Carlson* (1960) 184 Cal.App.2d 51, 57 [7 Cal.Rptr. 282] ["mani-festly unfair to apply the rule unless the person against whom it is sought to

be applied was apprised of the claim of 'unclean hands' "].) The unclean hands doctrine would be inapplicable in any event.

The unclean hands doctrine does not apply if the inequitable conduct did not occur in the transaction to which the relief sought relates. (*Pepper v. Superior Court* (1977) 76 Cal.App.3d 252, 259 [142 Cal.Rptr. 759].) The alleged inequitable conduct here did not relate directly to the withdrawing partners' capital accounts. Indeed, as noted in the arbitration award, some of the withdrawing partners had negative capital accounts.

This is not a case in which a party can be prevented against an accounting, because all the parties sought an accounting and the remaining partners conceded that the withdrawing partners were entitled to the amount of their capital accounts. In their counterdemand for arbitration, respondents Belgum, OB and Marie Belgum requested a determination of the respective interest of each present and former partner of OB. They specifically requested an order "Directing the distribution of the assets and property of O'Flaherty & Belgum in the possession and control of its receiver, including those amounts determined by the arbitrator to be owed . . . to the partners of O'Flaherty & Belgum in accordance with the arbitrator's determination of their respective interests in the assets and property of the partnership." Also, in a filing before the receivership court, Belgum, in requesting a discharge of the receiver said, "the withdrawing partners' sole interest in O&B assets is a right to return of their capital accounts."

The doctrine of unclean hands is applied to "leave the plaintiff in the position in which he is situated when he seeks the assistance of the court" (*Rosenfeld v. Zimmer* (1953) 116 Cal.App.2d 719, 722 [254 P.2d 137]), not to punish a plaintiff. And the doctrine of unclean hands "must not be applied where to do so would create an injustice. [Citation.] It is neither proper nor necessary to sacrifice justice in order to vindicate the honor of the court." (*Hill v. Younkin* (1969) 274 Cal.App.2d 880, 883 [79 Cal.Rptr. 509].) Here, unclean hands, if applied, would result in a forfeiture, in addition to damages and punitive damages—a manifest injustice. The award imposes upon certain parties a significant economic burden. The application of unclean hands to effect a forfeiture is inconsistent with "the Anglo-American legal maxim that 'equity abhors a forfeiture' [and] the law 'traditionally disfavors forfeitures . . . .' " (*People v. Far West Ins. Co.* (2001) 93 Cal.App.4th 791, 795 [113 Cal.Rptr.2d 448].)

*Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 448, footnote 8 [99 Cal.Rptr.2d 678] did not reach the unclean hands issue in a partnership dispute. Instead, the court held that there "was no legal basis to deny *all* relief under the 'do equity' doctrine" in connection with a law

partnership dispute and accounting action. Cases that suggest that the doctrine of unclean hands can be a defense to an action for an accounting are not applicable because here the withdrawing parties seek, and are entitled to, that to which they have a legal right under the explicit terms of the partnership agreement, notwithstanding their conduct. (See *Thomas v. Marvin E. Jewell & Co., supra,* 440 N.W.2d at p. 443.)

The arbitrator exceeded his power and jurisdiction not to "grant any remedy which is either prohibited by the terms of this [partnership] agreement" or to "grant any remedy which is either prohibited by this term of this [Partnership] Agreement, or not available in a court of law." "An arbitrator exceeds his powers when he acts without subject matter jurisdiction . . . fashions a remedy that is not relatively related to the contract . . . or selects a remedy not authorized by law. [Citations.] In other words, an arbitrator exceeds his powers when he acts in a manner not authorized by the contract or by law." (*Jordan v. Department of Motor Vehicles, supra,* 100 Cal.App.4th 431, 443.) By providing a remedy inconsistent with the provisions of the partnership agreement and specifically in contradiction to the partnership agreement provision that the arbitrator has no power to order a remedy prohibited by the agreement or not available in a court of law, the arbitrator in effect awarded "a remedy expressly forbidden by the arbitration agreement." (*Advanced Micro Devices, Inc. v. Intel Corp., supra,* 9 Cal.4th at p. 381.) In view of the arbitrator's acts in excess of his power and jurisdiction, the warnings in *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1 [10 Cal.Rptr.2d 183, 832 P.2d 899] and *Advanced Micro Devices, Inc. v. Intel* (1994) 9 Cal.4th 362 [36 Cal.Rptr.2d 581, 885 P.2d 994] concerning the limitations on judicial power over arbitration awards are not applicable.

### 3.  *Effect of Receiver*

The receivership court appointed an "all-purpose" receiver to manage the business of OB, a partnership in dissolution. The January 1998 order appointing the receiver specifically provided that, "[t]*he Receiver is vested with all the usual powers, rights and duties of Receivers appointed by this Court or otherwise defined by statute.*" (Italics added.) The order further defined the scope of the receiver's powers by directing that the receiver will "*operate and conduct the Partnership in the ordinary and usual course of its business other than practicing law*" pending the resolution of the arbitration between the individual partners. (Italics added.) Nevertheless, Attorney Morgan, over the objection of the receiver, filed an action and then a counterdemand for arbitration on behalf of OB.

The trial court's orders and rulings compelling arbitration were limited specifically to the individual partners and did not encompass OB. Moreover,

regardless of how the trial court ruled, only the receivership court had jurisdiction to determine all issues relating to the receivership. (See Super. Ct. L.A. County, Local Rules, rule 2.5; *Glade v. Glade* (1995) 38 Cal.App.4th 1441, 1449–1450 [45 Cal.Rptr.2d 695] [it is beyond the jurisdictional authority of a court in one department of a superior court to interfere with the exercise of jurisdictional power of a department to which the proceeding has been so assigned].)

■ In the absence of a specific order to the contrary, a receiver appointed for a dissolved partnership has the sole authority to commence an action on behalf of a dissolved partnership. (See Code Civ. Proc., § 568; *Vitug v. Griffin* (1989) 214 Cal.App.3d 488, 496 [262 Cal.Rptr. 588] [a receiver stands in the shoes of the owner, and is a representative of the court, creditors, and others whose claims might arise in the estate in receivership]; 2 Ballantine & Sterling, Cal. Corporation Laws (4th ed. 2003), § 307.01, pp. 14–72 [appointment of receiver for corporation "results in the suspension of the authority of its directors and officers over its business and property"]; 2 Clark on Receivers (3d ed. 1959), § 548(a), p. 889 [court appointing receiver has exclusive jurisdiction as to control over property].) An arbitrator may not encroach upon the jurisdiction of the receivership court. (*Marsch v. Williams* (1994) 23 Cal.App.4th 238, 246 [28 Cal.Rptr.2d 402].) The receivership is in the hands of the receiver, and "is under the control and continuous supervision of the court." (*Turner v. Superior Court* (1977) 72 Cal.App.3d 804, 813 [140 Cal.Rptr. 475].)

■ An executor or trustee of an estate is the real party in interest for purposes of bringing a claim on behalf of those estates. (See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2003), ¶ 2:6, p. 2-2.) "A receiver occupies a position generally analogous to that held by an executor in the law of probate or by a trustee in the law of bankruptcy" (*Shannon v. Superior Court* (1990) 217 Cal.App.3d 986, 993 [266 Cal.Rptr. 242]), and therefore, like an executor and bankruptcy trustee, who are real parties in interest over their estates, the receiver is likewise the real party in interest over the receivership estate. Because individual partners may not sue for damages to the partnership or their interests in the partnership (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶ 2:15.5, pp. 2-8 to 2-9), only the receiver for the partnership can maintain such claims.

In the absence of authorization of the receiver and over the receiver's objection, Attorney Morgan did not have the power or right to prosecute any claims on behalf of OB in the arbitration, and the arbitrator did not have jurisdiction to consider OB's claims. (See *Curtis v. Kellogg & Andelson* (1999) 73 Cal.App.4th 492, 506 [86 Cal.Rptr.2d 536] [trial court properly

sustained demurrers as to claims individually brought by debtors when the claims were the property of the bankruptcy trustee]; *Anmaco, Inc. v. Bohlken* (1993) 13 Cal.App.4th 891 [16 Cal.Rptr.2d 675] [trial court properly dismissed claims brought by president on behalf of a corporation, when the president did not have the power or authority to commence an action on corporation's behalf].) The exclusive jurisdiction of the receiver to manage the affairs of OB could not be waived by anyone other than the court. (*Morand v. Superior Court* (1974) 38 Cal.App.3d 347, 353 [113 Cal.Rptr. 281] [when receiver was authorized to commence action against certain defendants, portion of action that included additional defendants was jurisdictionally defective].)

Although the receivership court was aware of Attorney Morgan's actions on behalf of OB over the opposition of the receiver, the receivership court never expressly authorized or ratified such act. Rather, the receivership court expressly said it was not ruling one way or another, but would leave the matter to the Court of Appeal.

Thus, because of the receiver's opposition and the inaction of the receivership court, the arbitrator exceeded his jurisdiction in purporting to adjudicate OB's claims.[4] That adjudication cannot be severed against the award. The arbitrator's determination that the withdrawing partners violated OB's rights are intertwined with findings as to other parties. The arbitrator based the award, in part, on his determination that the withdrawing partners improperly caused the appointment of the receiver. We cannot say that the presence of, and those portions of the award relating to, OB did not affect the remaining portion of the award. (See *Handy v. First Interstate Bank* (1993) 13 Cal.App.4th 917, 928 [16 Cal.Rptr.2d 770] [refusing to uphold a portion of an arbitration award because the "arbitrator's determination of Continental's rights and liabilities was closely intertwined with his findings regarding Truck's coverage and defense obligations. For that reason, we cannot say Continental is not affected by our conclusion those matters were improperly decided in the arbitration proceeding"].) Because we cannot say what effect the adjudication of the OB claims had on the award, the entire award must be vacated. The fact that the receiver has now been discharged is of no consequence.

### 4. *Vacation of the Award*

■ This award that exceeds the arbitrator's jurisdiction is not susceptible to correction under Code of Civil Procedure section 1286.6, subdivision (b)

---

[4] Even if the withdrawing partners could waive this defect, they did not do so. They raised the issue at appropriate times.

because it may not "be corrected without affecting the merits of the decision upon the controversy submitted." As noted, the unauthorized involvement of OB potentially affected other aspects of the award. Similarly, the forfeiture of the capital accounts also potentially affected the damage award. Had the capital accounts not been forfeited, an accounting would have been required. Without such an accounting, we cannot determine the amounts in the capital accounts. In vacating the award, the interim award is also vacated because an interim award, unless confirmed, is not a final award.

## DISPOSITION

The judgment is reversed with directions to the trial court to vacate the arbitration award (Code Civ. Proc., § 1286.2, subd. (d)). All parties are to bear their own costs on appeal.

Armstrong, J., concurred.

**GRIGNON, Acting P. J.,** Dissenting.—As our Supreme Court noted in *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 10 [10 Cal.Rptr.2d 183, 832 P.2d 899], " 'When parties agree to leave their dispute to an arbitrator, they are presumed to know that his award will be final and conclusive . . . .' [Citation.]" " '[C]onclusiveness is expected; the essence of the arbitration process is that an arbitral award shall put the dispute to rest.' " (*Ibid.*) " 'The parties [to an arbitration] can take a measure of comfort in knowing that the arbitrator's award will almost certainly mean an end to the dispute.' [Citation.]" (*Ibid.*) "This expectation of finality strongly informs the parties' choice of an arbitral forum over a judicial one. The arbitrator's decision should be the end, not the beginning, of the dispute." (*Ibid.*) "Ensuring arbitral finality thus requires that judicial intervention in the arbitration process be minimized." (*Ibid.*) "[T]he existence of an error of law apparent on the face of the award that causes substantial injustice does not provide grounds for judicial review." (*Id.* at p. 33.) With these precepts of our Supreme Court clearly in mind, I would affirm the trial court's order confirming this contractual arbitration award.

## INTRODUCTION

Appellants Michael A. O'Flaherty, John J. Weber, Lee T. Thies, Robert M. Dato, Lisa A. Cross, Mike Martinez, Lynn E. Ovando, and Gregory M. Hatton (collectively the withdrawing partners), the law firm of O'Flaherty, Cross, Martinez, Ovando & Hatton LLP (OCMOH), and the law firm of O'Flaherty, Cross, Martinez & Ovando LLP (OCMO) appeal against a judgment confirming an arbitration award in favor of their former partners and former law firm O'Flaherty & Belgum (OB) in this action concerning the

withdrawal of the partners, dissolution of the partnership, and the appointment of a receiver for the partnership. Stephen L. Belgum (Belgum), his former wife Marie Belgum, and OB are the respondents. Appellants contend: (1) the arbitrator exceeded his powers by adjudicating claims instituted by Belgum's attorney on behalf of OB that could be prosecuted only in the receiver's name; (2) the arbitrator exceeded his powers by finding that the withdrawing partners had forfeited their interests in OB and no accounting of their capital accounts was required; (3) the award should have been vacated based on the arbitrator's failure to disclose he had been represented in two matters by the law firm that represented appellants during part of the arbitration proceedings; (4) the arbitrator failed to disclose circumstances concerning his separation against a former law firm that could cause a reasonable person to doubt his ability to be impartial; (5) the trial court abused its discretion by denying discovery requests concerning the arbitrator's separation against the law firm; and (6) due process requires judicial review of the punitive damages award.

## FACTS AND PROCEDURAL BACKGROUND

*The Partnership Agreement*

OB was a medical malpractice defense firm formed in 1988. On January 1, 1997, OB was reformed pursuant to an amended partnership agreement. OB's 12 equity partners were: Belgum, O'Flaherty, Weber, Hatton, Thies, Dato, Cross, Ovando, Martinez, Todd Theodora, Ernest Chen, and Nancy Wanski. Belgum was the managing partner.

Involuntary termination of a partner was provided for in section 13.1 of the partnership agreement as follows: "A Partner may be expelled against membership in the Partnership with or without cause, by and upon a vote as set forth in paragraph 6.2." Section 13.2 provided that if a partner was involuntarily terminated for cause, the former partner "shall be entitled only to the amounts set forth in Article 16 [providing for return of the terminated partner's capital account], and shall not be entitled to Deferred Compensation. The term 'for cause,' as used herein, shall mean the following acts by a Partner [or] the respective Principal of a Partner: grievous actions against the Partnership, dishonesty, alcohol, chemical or drug addiction, conviction of a criminal offense involving moral turpitude or disbarment, suspension, public or private reproval by the State Bar . . . or any similar acts or events." If a partner was involuntarily terminated other than for cause, the former partner was entitled to receive deferred compensation in accordance with a percentage multiplier contained in the partnership agreement. The primary percentage ratios of the equity partners were: Belgum (18.6528), O'Flaherty (18.6528), Weber (6.0450), Hatton (7.5994), Thies (5.0087), Dato (4.4906), Cross (6.5630), Ovando (6.5630), Martinez (5.3541), Theodora (8.9809),

Chen (5.5267), and Wanski (6.5630). The combined primary percentage ratio of the withdrawing partners was approximately 60.

Section 11.3 provided that a change in partnership membership did not constitute a dissolution of the partnership. Most matters concerning the management and operation of the partnership were decided by a vote of a majority of the partners based on their interests in the partnership. Procedures for voting on partnership matters were set forth in section 6.2 as follows: "Each Partner shall have the number of votes equal to the share of the Primary percentage Ratio allocated to said Partner pursuant to Article 5 hereof, as such points are fixed for each calendar year. Except as otherwise expressly provided in this Agreement, all Matters concerning the management and operation of the Partnership, except those matters determined by the Compensation Committee, shall be decided by a vote of a majority in interest of the Partners based on the Primary Percentage Ratio outstanding at the time of the vote." A quorum was established by the attendance of partners holding more than 50 percent of the partnership points at a meeting of the partners duly called and duly held. Section 6.7 provided for proxies: "A Partner may issue a Proxy in favor of another voting Partner . . . for purposes of registering his or her vote at a meeting if the Partner is unable to attend. The Proxy may be used both in determining a Quorum for the meeting and the voting at a meeting. However, in no event shall more than twenty percent (20%) of the total number of votes be allowed to be represented by Proxies at any one meeting."

Voting procedures for dissolution of the partnership were an exception provided for in section 6.2.1: "Dissolution of the Partnership, including a dissolution arising against . . . an involuntary termination of a Partner may be effected only by the affirmative vote of both [O'Flaherty] and [Belgum] and ·not pursuant to the California Corporations Code. In addition, any amendment to the provisions of Articles 12 through 18 that affects the rights of any Former Partner then entitled to benefits under said provisions by reason of an Event of Termination, may only be made with the consent of said Former Partner."

Section 20.1 provided for arbitration of disputes: "Except as otherwise provided in this Agreement, any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled by mediation, or by arbitration before a single arbitrator in Los Angeles, California." In addition, section 20.5 provided: "Each of the parties reserves the right to file with a court of competent jurisdiction an application for temporary or preliminary injunctive relief, writ of attachment, writ of possession, temporary protective order and/or appointment of a receiver on the grounds that the arbitration award to which the applicant may be entitled may be rendered

ineffectual in the absence of such relief." Section 20.9 provided: "The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement . . . or not available in a court of law." Section 20.11 provided: "The costs of the arbitration . . . shall be borne equally by the parties to the arbitration. Attorneys' fees may be awarded to the prevailing or most prevailing [party] at the discretion of the arbitrator." Section 21.5 provided for awarding attorney fees to the prevailing party in the event of litigation or arbitration involving the interpretation or enforcement of the agreement.

*Conspiracy to Form a New Partnership*

In July 1997, Theodora withdrew against the partnership. In August 1997, a majority of the partners voted to designate Weber as the managing partner. O'Flaherty and other partners perceived Belgum as devoting the majority of his time to his cattle ranch in Colorado, billing minimal hours for the law firm, obstructing efforts to terminate employees and streamline OB's expenses, and disrupting the professional atmosphere of the firm by engaging in affairs and a vitriolic divorce.

On October 12, 1997, O'Flaherty, Cross, Martinez, Ovando, Hatton, Weber, Thies, and Dato formed the law partnership OCMOH. They agreed to withdraw simultaneously against OB, immediately announce the formation of OCMOH, solicit OB's clients and desirable employees, and take over desirable OB office space, furniture, equipment, and supplies to use in starting up OCMOH. They made no plans to finance the competing firm other than through OB's business and assets and by representing themselves as a lawful successor to OB. They conspired to deprive Belgum of his interest under the partnership agreement, including his "receivables buildup account" valued at $1.3 million. On November 10, 1997, Belgum invited the eight withdrawing partners to meet and discuss the partnership, their partnership relationship, and reports of complaints about Belgum's participation as a partner of OB. None responded.

Hatton contacted Attorney Stanley Jones for advice concerning the partnership agreement and the potential resolution of issues if submitted to an arbitrator. Attorney Jones provided written opinions in response to Hatton's inquiry. He stated that if the partnership dissolved and a former partner completed work on a file that was open on the date of dissolution, the partner was required to account to the partnership for the net profit. The profit would be divided by the profit-sharing ratio set forth in the partnership agreement. He also stated that under the partnership agreement, a voluntary dissolution could occur only by the affirmative vote of both O'Flaherty and Belgum.

However, an involuntary dissolution could be decreed by a court on the ground that a partner had willfully and persistently breached the partnership agreement or otherwise engaged in conduct relating to the partnership business such that it was not reasonably practicable to carry on the business in partnership with him or her. Attorney Jones stated that upon dissolution, voluntary or involuntary, the partnership agreement required a special allocation of profit. As of December 31, 1996, Belgum had $1,302,991.03 in his receivables buildup account. Using that balance, Belgum's profit-sharing ratio in any dissolution would be approximately 38 percent, as opposed to Belgum's 18.6 percent primary percentage ratio. Attorney Jones opined that a partner could be terminated involuntarily with or without cause by a vote of the majority of the partners as provided in the partnership agreement. Belgum's affirmative vote was not required for his termination. If the partner were terminated for cause, the former partner would only be entitled to return of his or her capital account and would not be entitled to deferred compensation. Therefore, the only way to avoid paying a former partner deferred compensation was to terminate the partner for cause. However, until an arbitrator determined whether there was cause for the termination, the partnership would not have to pay any deferred compensation. Attorney Jones emphasized that alternative courses of conduct had to be considered in light of the premise that partners had fiduciary duties to one another and were required to act in the highest good faith toward copartners.

Weber gave notice of a partnership meeting to be held on December 18, 1997. Under the partnership agreement, partners who voluntarily withdrew were required to provide 30 days' advance notice to the partnership. At the meeting, the withdrawing partners enacted a resolution amending the partnership agreement to waive the 30-day advance notice requirement and instead made the effective date for any partner who gave notice of voluntary withdrawal December 31, 1997. The withdrawing partners also enacted a resolution amending the partnership agreement to waive any objection to a partner who had given notice of withdrawal immediately soliciting associate attorneys and other OB employees in connection with possible employment by the withdrawing attorney. The resolution also amended the partnership agreement to permit a withdrawing attorney to inform clients for whom the withdrawing partner performed legal services that the partner was withdrawing. The withdrawing partners then withdrew as partners.

The withdrawing partners began notifying OB's clients that they had withdrawn against OB, OB was dissolving, and Belgum would no longer practice law. They solicited OB's clients to transfer existing business and cases to OCMOH. The withdrawing partners told OB employees that OB would be dissolved as of December 31, 1997, and all positions terminated unless the employees were offered and accepted employment with OCMOH.

The withdrawing partners used OB's offices, equipment, supplies, and employees to promote OCMOH.

On December 22, 1997, Belgum, Wanski, and Chen (the remaining partners) held a partnership meeting. They designated Belgum as the managing partner. Belgum sent a letter to Union Bank informing the bank that none of the withdrawing partners had any authority to exercise any control over OB's account. Notice of the withdrawals was required under the terms of OB's financing agreement. The bank refused to make payment on checks that had been written on the account, and credit cards were disrupted or cancelled. On December 23, 1997, the withdrawing partners began preparation of a receivership application.

On December 26, 1997, the withdrawing partners held a partnership meeting. O'Flaherty, Weber, Theis, Cross, and Martinez attended in person. Hatton, Ovando, and Dato appeared by proxy. During the meeting, the attending partners and proxies voted to expel Belgum against the partnership for cause effective December 30, 1997. The withdrawing partners voted to dissolve OB as of December 31, 1997. They agreed the decision regarding dissolution of the partnership could be determined by facsimile transmittals, rather than meeting in person. None of the actions taken at the meeting were effective, because the number of votes cast by proxy exceeded the 20 percent limit permitted by the partnership agreement.

The withdrawing partners appointed Weber as liquidating administrator. After December 31, 1997, the withdrawing partners continued to use OB's offices, furniture, supplies, and equipment for their new partnership. OB had accounts receivable and work in progress valued between $2 million and $5 million. Approximately 28 of the former OB associates and most of the administrative staff joined the new partnership.

*The Wanski Action*

On January 12, 1998, Wanski filed a complaint against the withdrawing partners and OCMOH for breach of contract, intentional violation of fiduciary duty, conversion, appointment of an impartial receiver, an accounting, and judicial dissolution of the partnership. She alleged that in the absence of the appointment of an impartial receiver, she would suffer substantial economic damages. On January 20, 1998, the withdrawing partners filed a cross-complaint against the remaining partners for declaratory relief and appointment of a receiver. They reserved their right to arbitration. They stated that the disputes between the parties included: who was the managing partner; whether Belgum had been expelled; whether OB was properly dissolved effective December 31, 1997; and issues concerning the use of OB's offices

and property. They also stated: "A receiver should be appointed by the court to hold the Partnership's property and wind up the Partnership's affairs while the disputes between the parties are being resolved in order to preserve the Partnership's value and insure the effect of any arbitration award and resulting judgment specifying how the Partnership should be wound up and liquidated."

On January 21, 1999, the withdrawing partners filed an application for an ex parte order appointing David Ray as receiver. They represented that OB was a partnership in dissolution. The receivership application was made "on the grounds that the partners in the Partnership cannot at this time agree on their respective rights and obligations under the Partnership Agreement and that therefore the full value of the assets, including the accounts receivable, the work in progress through December 31, 1997, and the leased premises and other personal property of the Partnership, are in danger of being lost during the pendency of this action and the arbitration of the disputes between the partners which the Partnership Agreement requires. [The withdrawing partners] submit that the appointment of a receiver is necessary to preserve the Partnership's value pending determination of this lawsuit and the arbitration and, most importantly, protect the former clients of the Partnership against sustaining irreparable damage as a result of disputes between the Partners." The application stated that nine of the remaining 11 equity partners (the withdrawing partners and Wanski) agreed OB had been dissolved on December 31, 1997, but Belgum asserted OB had not been dissolved. In addition, Belgum contended that the remaining partners were a continuation of OB. The receivership application stated that the partners could not agree as to payment of staff, substitutions of attorney, or payment for use of OB's offices and equipment. O'Flaherty and Weber submitted declarations opining that a receiver was necessary to bring stability, while the disputes between the partners were resolved through mediation or arbitration.

On January 21, 1998, the superior court found that a receiver was necessary and appointed David Ray to act as the receiver for OB (hereinafter, this court will be referred to as the receivership court). The receiver's powers included enforcing and collecting debts, instituting lawsuits as receiver to preserve and protect the partnership's assets, discharging obligations of OB against the funds in his possession, and engaging the services of counsel. The receivership court ordered the remaining partners to appear on February 10, 1998, to show cause why the receiver should not be confirmed.

On January 30, 1998, the receiver told the remaining partners to cease practicing as OB. They complied. The withdrawing partners delivered OB's property to the receiver or purchased the items for amounts below replacement value. The withdrawing partners and OCMOH acted as the receiver's

agents for billing and collection of OB's accounts receivables. They were paid against OB's receivership estate for their services.

The receivership court confirmed the receiver's appointment on February 10, 1998. On February 25, 1998, Belgum filed a motion for an order discharging the receiver and terminating the receivership on the grounds that OB had not been dissolved and no receiver was required to manage the assets. He argued that because no dissolution had been effected, there was no entitlement to a receivership for dissolution purposes. In addition, Belgum argued that the withdrawing partners had violated the partnership agreement, and therefore, their interests in OB's assets were limited to the return of their capital accounts. Wanski joined in Belgum's motion, and Chen filed a nonopposition. After a hearing on March 13, 1998, the receivership court took the matter under submission. Later that day, the receivership court denied the motion to discharge the receiver.

The receiver filed a petition for instructions. After a hearing on April 3, 1998, the receivership court ordered as follows: (1) the receiver should request an accounting of net profits against OCMOH for OB clients since dissolution; (2) the receiver should execute substitution of attorneys for OB clients; (3) OCMOH's claim to payments for work on OB cases should be treated as any other claim that would await final disposition through the arbitration process; (4) the receiver should pay for services provided to OB by OCMOH; (5) the receiver should pursue collection of rent against former OB partners using and occupying receivership property.

On May 26, 1998, the withdrawing partners filed a petition in the superior court for an order staying the Wanski action and compelling arbitration (hereinafter this court will be referred to as the trial court). They stated that the disputed issues included: whether Belgum was properly involuntarily terminated for cause; whether the partnership was properly dissolved by a vote of the majority in interest effective December 31, 1997; whether Belgum's consent was required to dissolve the partnership; and whether the withdrawing partners were obligated to account to the remaining partners for profits earned in connection with completing OB client matters after December 31, 1997. The withdrawing partners requested that the trial court order the remaining partners to arbitration and retain jurisdiction over the receiver and the receivership estate. On July 30, 1998, the trial court granted the petition and dismissed the action, but retained jurisdiction to enforce the arbitration award and to monitor the actions of the receiver and the receivership estate.

*The Belgum Action*

On December 17, 1998, Attorney Steven Morgan filed a complaint on behalf of Belgum and OB against the withdrawing partners and OCMOH for

breach of written contract, intentional breach of fiduciary duty, conversion, defamation, intentional interference with contracts, and intentional interference with economic advantage. Belgum filed a motion to vacate the dismissal of the Wanski case and restore it to the active calendar for failure to institute arbitration proceedings. The withdrawing partners stated that they had not instituted arbitration proceedings, because their claims to shares of the net assets after liquidation could be litigated in the receivership proceeding. The withdrawing partners argued it was the responsibility of the remaining partners to institute arbitration proceedings to pursue other claims. On March 17, 1999, the trial court altered the July 30, 1998 order nunc pro tunc to state that the matter was stayed pending arbitration, rather than dismissed. The trial court set an order to show cause why the stay should not be dissolved for failure to arbitrate.

On March 30, 1999, the withdrawing partners sent a demand for arbitration to the remaining partners, in accordance with the rules of the American Arbitration Association (AAA). The demand stated that the nature of the dispute was the proper distribution of the net proceeds to the partners against the court-ordered liquidation of OB after the liquidation conducted by the court-appointed receiver had been completed.

On March 30, 1999, the receiver demanded in writing that Attorney Morgan immediately cause the dismissal of OB against the lawsuit. The receiver stated that he was the only person authorized to bring a lawsuit on behalf of OB and he did not authorize Attorney Morgan to file the Belgum action on behalf of OB.

On April 5, 1999, the withdrawing partners petitioned the trial court for an order compelling arbitration in the Belgum action. In addition, they objected to Belgum's standing to bring an action on behalf of OB and stated that the receiver had demanded Belgum's attorney dismiss OB as a plaintiff. Attorney Morgan filed an opposition to the petition to compel arbitration on behalf of Belgum and OB. On April 23, 1999, the trial court granted the petition to compel arbitration and stayed the action.

On May 7, 1999, the Wanski and Belgum actions were found to be related and were assigned to the trial court in the Wanski action for all purposes. On July 19, 1999, Marie Belgum filed a complaint in intervention in the Wanski action. On August 18, 1999, a status conference was conducted. The trial court ordered the case to binding arbitration and stayed the case pending arbitration. The trial court retained jurisdiction to enforce the arbitration award. In September 1999, Hatton and Dato withdrew against OCMOH and went to work for separate law firms. OCMOH became OCMO.

On November 18, 1999, Attorney Morgan filed a counterdemand for arbitration with the AAA on behalf of Belgum, OB, and Marie Belgum. The counterdemand stated that the nature of the dispute included determination of the causes of action stated in the complaint in the Belgum action and the complaint in intervention; the respective interests of each partner or former partner; the effect of the withdrawing partners' actions; the amounts owed by the withdrawing partners as a result of their actions; the amounts owed to OB for expenses and losses incurred by OB as a result of placing and maintaining OB in receivership; the amounts owed to OB by any withdrawing partner under the partnership agreement; the amounts owed to OB by the withdrawing partners for diminution in value of OB's accounts receivable and other assets; the liability and amounts owed to Theodora as a result of Theodora's voluntary withdrawal; all claims made by the withdrawing partners and OCMOH against OB in the receivership claims procedure; the amounts owed to Belgum, OB, and Marie Belgum for attorney fees, costs, and arbitration fees; whether OB was dissolved by the actions of the withdrawing partners; and the current status of OB. Belgum, OB, and Marie Belgum sought an order determining the issues, compelling payments owed to them and directing distribution of OB's assets currently in the possession and control of the receiver. Theodora also filed a counterdemand for arbitration.

On March 31, 2000, the withdrawing partners and OCMOH substituted the law firm of Bird, Marella, Boxer & Wolpert as their counsel of record. In June 2000, Edward Costello, Jr. was selected as the neutral arbitrator. The arbitrator's resume stated that he had worked as a special agent of the Federal Bureau of Investigation against 1964–1968; an associate at O'Melveny & Myers against 1968 to 1972; a partner at Costello & Walcher and "predecessor firms" against 1972 to 1984; a partner at Proskauer, Rose, Goetz & Mendelsohn against 1984 to 1989; and an arbitrator against 1989 to the present. On July 26, 2000, the arbitrator provided his disclosure statement to the parties. In response to the question, "Do you or have you had any attorney-client relationship with any party or lawyer for a party to this proceeding?," the arbitrator had checked the box "No." He also indicated that there were no circumstances that would prevent him against being a neutral arbitrator. In July 2000, Wanski entered into a settlement agreement and assigned her interest in OB to the withdrawing partners. In October 2000, Belgum retained a new attorney as his counsel of record. Belgum instructed Attorney Morgan to pursue OB's claims, and Attorney Morgan continued to act as counsel of record for OB. Attorney Morgan continued to assist Belgum's counsel.

On October 20, 2000, OCMOH and OCMO joined in the withdrawing partners' demand for arbitration. OCMOH and OCMO sought resolution of whether OCMOH or its partners should be paid on cases in which they substituted for OB; the amount OCMOH or its partners should be reimbursed

for expenses paid on behalf of OB; the amount OCMOH or its partners should be paid against the proceeds of the court-ordered liquidation of OB; the amount Belgum should reimburse OB for tangible assets he had taken; and the amounts Belgum and Chen owed OB as a result of fees incurred for personal matters. OCMOH and OCMO requested that the arbitrator order Belgum and Chen to reimburse OB and OB to reimburse OCMOH.

*The Arbitration*

On November 13, 2000, the liability phase of the arbitration commenced. The receiver sent a letter by fax to the withdrawing partners' attorney, stating that the receiver was the only authorized representative of OB. The receiver stated that he had not retained or authorized anyone to represent OB or the receiver in the arbitration proceeding, because neither was a proper party to the litigation. The receiver's interpretation of the order appointing him was that the partners were to complete arbitration of all disputes between the partners and not the receiver. The withdrawing partners brought the letter to the attention of the arbitrator. Hearings were held on November 13–17, 2000. The arbitration was continued. At the end of January 2001, the withdrawing partners substituted the law firm of Daar & Newman as their attorneys of record in place of Bird, Marella.

Additional hearings in the liability phase of the arbitration were held on February 26 to 27, 2001, and March 14 to 16, 19 to 21, and 23, 2001. On April 7, 2001, the arbitrator issued the following interim findings of liability. The withdrawing partners were jointly and severally liable to Belgum for damages resulting against breach of contract and breach of their fiduciary duty. The withdrawing partners were jointly and severally liable to OB for damages resulting against breach of their fiduciary duty to OB, including expenses OB incurred because of the receivership imposed by the trial court. The withdrawing partners, OCMOH, and OCMO were liable to Belgum for damages resulting against intentional interference with OB's business relations. The withdrawing partners, OCMOH, and OCMO were liable to OB for damages resulting against conversion of OB's property. In addition, O'Flaherty, Hatton, and Weber were liable to Belgum for punitive damages for their breach of fiduciary duty toward Belgum. The withdrawing partners, Wanski, and Chen were separately liable to OB for the negative balances of their respective capital accounts as determined pursuant to the partnership agreement. Hatton was liable to OB for the amount spent to defend and settle an employee's claim against Hatton. OB was not dissolved on December 26, 1997, and the dissolution date remained to be resolved in the second phase of the arbitration. Belgum, Marie Belgum, Chen, and OB were the prevailing parties.

*Disqualification Proceedings*

The attorney representing the withdrawing partners, OCMOH, and OCMO notified former counsel of record Bird, Marella of the interim award. The attorney learned against Bird, Marella that the arbitrator had previously been represented by Bird, Marella in a lawsuit against the arbitrator in 1996. The withdrawing partners asked the AAA to disqualify the arbitrator. The request was denied. On May 17, 2001, the withdrawing partners filed an ex parte motion in the trial court to disqualify the arbitrator and vacate all orders he had made, on the ground that the arbitrator had failed to make a mandatory disclosure under Code of Civil Procedure section 1281.9, subdivision (e). They argued that disclosure of the 1996 representation by Bird, Marella was mandatory and the arbitrator's failure to disclose the relationship created an inescapable impression of bias, rendering the arbitration proceedings voidable for corruption. They attached a copy of the complaint filed June 25, 1996, against the arbitrator, AAA, and others. The 1996 complaint sought declaratory relief for certain church members who objected to discovery ordered by the arbitrator on the ground that it violated their right to religious freedom. The withdrawing partners attached documents filed in the case by Bird, Marella Attorney Louise LaMothe on behalf of the arbitrator and AAA. Attorney LaMothe was not the Bird, Marella attorney who had represented the withdrawing partners, OCMOH, and OCMO in the arbitration proceedings before the arbitrator. The religious freedom case had been dismissed in October 1996 by stipulation of the parties.

A hearing was held on May 17, 2001. Belgum asserted that the trial court could not intervene in an ongoing arbitration proceeding. The withdrawing partners reiterated their contention that OB was not a proper party to the arbitration, because OB was in receivership and the receiver held OB's claims. They also asserted that a motion to disqualify the arbitrator could be made prior to filing a petition to vacate an arbitration award. The trial court requested further briefing. Another hearing was held on May 23, 2001. On May 31, 2001, the trial court issued an order denying the ex parte application to set a hearing on the motion to disqualify the arbitrator. The trial court found it did not have authority to intervene in the arbitration proceeding. Instead, the disqualification issue should be raised in a motion to vacate any award made in the arbitration proceeding. The trial court also stated that if it had discretion to intervene, given the extent of the arbitration proceedings that had transpired, it would exercise its discretion not to intervene. The trial court found that Bird, Marella had actual knowledge of the allegedly disqualifying circumstances prior to the arbitrator's ruling and no satisfactory explanation had been presented for failing to act until after the arbitrator had made his initial findings on liability.

*Receiver Requests Instructions*

The receiver received a copy of the interim award. On June 6, 2001, the receiver wrote to advise the arbitrator that he had not authorized anyone to take part in the arbitration on behalf of OB, and the person who had purportedly made an appearance for OB was not authorized to do so. The receiver requested that the arbitrator strike the counterclaims in OB's name against the order. On June 8, 2001, the receiver wrote to the arbitrator, stating that Belgum's attorney had asked the receiver to reconsider his position, and the receiver had decided to petition the trial court for direction.

On July 12, 2001, the receiver filed a motion with the receivership court for instructions concerning the interim arbitration award in favor of OB and the second phase of the arbitration. He requested permission to allow his law firm to represent him as his counsel for the arbitration proceedings. The receiver stated that he had not participated in the arbitration and had specifically told the parties and the arbitrator that OB was not to be part of the proceedings. However, the arbitrator had determined liability to OB based on a counterclaim filed in the arbitration by an attorney who had not been authorized to represent OB. The OB factions made conflicting demands on the receiver. One faction asked him to direct the arbitrator to rescind the portion of the award finding liability to OB, and the other faction threatened to sue him if he did. The receiver suggested four possible orders by the receivership court: (1) let the arbitration proceed and allow the parties to sort out the implications of the arbitration award without the receiver's involvement; (2) accept the benefit of the award and participate in the arbitration; (3) reject the award; or (4) stay the arbitration to allow the receiver to further investigate and make reasoned recommendations to the receivership court. The receiver submitted a declaration stating his understanding throughout the receivership proceeding had been that his role as receiver did not include proceeding against the individual partners on behalf of OB without further court order. The withdrawing partners filed a memorandum in partial support of the receiver's application, stating that the receiver's review of the litigation should encompass all claims OB might have, including claims for offset and collection of rent against the remaining partners for use of OB's premises.

A hearing was held on June 12, 2001, in the receivership court. After a quick review of the receiver's application, the receivership court suggested discussing the issue and setting another date for a full hearing. The receivership court stated its tentative ruling would be to instruct the receiver to do nothing and allow the arbitration to "proceed the way it has been proceeding. I don't really see the purpose of the Receiver intervening at this point and becoming part of it. [¶] . . . I just do not see the benefit to the receivership or

either party, any party, for the receiver's intervention. [¶] If anything[,] it is going to delay it because you are going to have new lawyers; you are going to have another party that will have to deal with it and will have to become further familiar and additional expense that someone is going to have to pay for."

The withdrawing partners noted that OB had participated in the arbitration, but neither the receiver nor any lawyer authorized by the receiver had appeared. The withdrawing partners argued that the receiver held OB's claims and only the individual partners had been ordered to arbitration. The withdrawing partners further argued that Attorney Morgan's actions violated the order transferring OB's claims to the receiver and contradicted directions against the receiver not to represent OB in the arbitration. They stated that the arbitrator had adjudicated OB's claims despite the receiver's letter stating that Attorney Morgan was not authorized to advocate OB's claims.

The withdrawing partners asked whether, in allowing the matter to go forward, the receivership court was permitting Attorney Morgan to continue to represent OB without authorization against the receiver. The receivership court stated: "I don't see any reason for changing that aspect at this point either. [¶] [It's] now at a point where there's [a] partial judgment, where there's very little left to go. Whatever will be, will be, and at that point we will see where everything is, and we will go against there." The receivership court denied the ex parte application by the receiver for instructions regarding participation in the arbitration proceeding. The receivership court instructed the receiver not to participate in the arbitration and for the arbitration to proceed as it had been proceeding to date.

*Final Award*

The arbitration concluded on August 28, 2001. The arbitrator's final award included the following findings. Under section 6.2.1 of the partnership agreement, the following actions were not effective without an affirmative vote of both O'Flaherty and Belgum: (1) dissolution of the partnership; (2) amendment of the partnership agreement; (3) admission of a person to membership as a partner; or (4) involuntary termination of a partner. The withdrawing partners held a majority of the primary percentage ratio during 1997. After July 1, 1997, the withdrawing partners had the authority to take actions necessary to improve OB's financial performance, including reductions in staff, associate attorneys, operating expenses, and client billing, as well as any other measure that did not require Belgum's affirmative approval. The withdrawing partners' actions in October 1997 set them up as competitors to OB, breached their fiduciary duties to OB, and forfeited any rights they previously had to participate in the governance of OB or share in its

assets or profits. The withdrawing partners' failure to respond to Belgum's November 10, 1997 invitation to discuss the partnership was evidence that the withdrawing partners were aware of the impropriety of their meetings and wanted to avoid revealing their conspiracy.

The withdrawing partners' actions at the December 18, 1997 partnership meeting were to benefit OCMOH at the expense of OB and to assist the withdrawing partners in the expropriation of OB's practice for OCMOH. The December 18, 1997 resolutions amending the partnership agreement were ineffectual because: (1) Belgum's consent was required and he did not consent; and (2) the withdrawing partners were precluded by their fiduciary duties to OB against adopting resolutions intended to benefit OCMOH to the detriment of OB. The withdrawing partners' actions on and after December 18, 1997, were pursuant to the conspiracy formed in October 1997 with the specific intent (1) to disrupt and destroy OB's practice; (2) to injure Belgum and deprive him of his rights under the partnership agreement; and (3) to "hijack" the law firm by taking desired employees, pending cases, and clients against OB to OCMOH. The withdrawing partners were aware at the time they voted to enact the resolutions that the resolutions and the solicitations authorized by the resolutions were improper under the partnership agreement and their fiduciary duties to OB and the remaining partners.

The receivership application was prepared in order to prevent OB against competing with OCMOH and to make OB's assets available to OCMOH at bargain prices, through liquidation, and to prevent the remaining OB partners against making use of OB's assets. The actions for which Belgum was purportedly terminated at the December 26, 1997 partnership meeting did not constitute cause for expulsion under the partnership agreement. In voting to expel Belgum, the withdrawing partners acted for their personal benefit. They intended to deny Belgum monies to which he would otherwise be entitled upon OB's dissolution, which monies would then be shared by the withdrawing partners. They also intended to further their plan to expropriate OB's practice by removing the restriction on dissolution requiring Belgum's affirmative vote. The withdrawing partners voted to expel Belgum in bad faith and not for any legitimate purpose of the OB partnership. The resolutions to expel Belgum and dissolve OB were ineffective because (1) too many of the votes were by proxy, (2) Belgum did not agree to them as required by the partnership agreement, and (3) the withdrawing partners' fiduciary duties to OB and the remaining partners precluded them against adopting resolutions intended to benefit OCMOH to the detriment of OB.

The actions of the withdrawing partners against October 12, 1997, constituted multiple breaches of contractual and fiduciary duties owed to OB and the remaining partners. Because Belgum was a senior "name" partner, the

withdrawing partners told OB's clients and potential clients that Belgum was expelled against the partnership for cause in order to damage OB's ability to continue practicing law in competition with OCMOH. The withdrawing partners did not perceive Chen or Wanski to be as big a threat to their interests. Chen's and Wanski's financial interests were de minimis compared to Belgum's financial interest. The withdrawing partners' actions constituted multiple willful, malicious, and fraudulent breaches of fiduciary duties owed to OB and the remaining partners, committed with the specific intent of damaging both OB and Belgum. In addition, the withdrawing partners' communications with employees and clients of OB beginning on December 18, 1997, constituted intentional interference with OB's business relations.

The withdrawing partners did not reimburse OB for the reasonable value of the offices, equipment, supplies, and employees paid for by OB and used by the withdrawing partners against October 12, 1997, to December 31, 1997, to set up and promote the business of OCMOH. This use constituted conversion of OB's property. The withdrawing partners' exclusive use and possession of OB's furniture, supplies, and equipment after December 31, 1997, constituted conversion of OB's property. They retained exclusive possession until it was delivered to the receiver or purchased by the withdrawing partners and OCMOH.

The withdrawing partners caused the receivership court to impose a receivership on OB in order to deny the remaining partners access to and use of OB's assets, especially OB's accounts receivable and work in progress, thereby preventing the remaining partners against using the goodwill and reputation of OB to continue OB's law practice in competition with OCMOH. The withdrawing partners obtained the imposition of the receivership and liquidation of OB's assets, based upon the representation to the receivership court that OB had been dissolved by the withdrawing partners' actions of December 26, 1997. The representation by the withdrawing partners was false, and the withdrawing partners either knew or should have known that the representation was false at the time it was made. In liquidating the assets, the receiver obtained less than the replacement value of the assets, and less than OB would have received in an orderly sale of the assets. The withdrawing partners purchased furniture, fixtures, and equipment at less than the replacement value of the assets and less than they would have had to pay on the open market. They have not returned the items, nor paid the fair market value. Their use and possession without paying fair market value constituted conversion.

After December 31, 1997, the withdrawing partners received profits and accounts receivable for legal work done in completion of matters begun by OB. OB was entitled to the share of the profits and accounts receivable

represented by the total primary percentage ratio of the remaining partners of OB at the time the profits were received or accounts receivable earned. OB has not been paid any share to date. Similarly, the withdrawing partners and OCMOH received profits for operating the practice expropriated from OB, and OB was entitled to damages. A fair measure of damages was the total percentage of primary profits participation of the remaining partners of the profits received and accounts receivable earned by the withdrawing partners and OCMOH for legal work done on matters begun by OB and, in addition, profits received and accounts receivable earned by OCMOH and OCMO for matters brought to OCMOH after December 31, 1997, by former OB clients.

"If [the withdrawing partners] had withdrawn against [OB] and established OCMOH without carrying out their conspiracy to expropriate [OB's] practice for OCMOH by wrongfully purporting to dissolve the partnership, it would not have been permissible to impose a receivership on [OB]." On December 31, 1997, OB had accounts receivable and work in progress valued between $2 million and $5 million, which would have been sufficient to meet its obligations, and fund continuing operations. As a result of being in receivership and using less effective collection methods than customarily used by OB, OB realized substantially less cash against the liquidation of its accounts receivables than its historical collection rate. Under the partnership agreement, a partner who withdrew with a deficit in his or her capital account was required to reimburse the partnership within 60 days of withdrawing, but the withdrawing partners had made no payments in reimbursement.

O'Flaherty, Weber, and Hatton were guilty of fraud, oppression, and malice against Belgum. In addition, Hatton owed OB an amount he had agreed to pay in connection with the defense and settlement of an employee's claim against him. OB was no longer a functioning law firm and should be dissolved as of July 31, 1998, as requested by Chen and Belgum. All of OB's assets and liabilities, other than the assets that were the subject of the arbitration, had been liquidated and no reason had been presented to warrant the continuation of the receivership estate. In addition to the liability findings of the interim award, Marie Belgum had a 50 percent interest in all sums recovered by Belgum, net of fees and costs. Belgum, Marie Belgum, OB, Chen, and Theodora were the prevailing parties. The withdrawal of the withdrawing partners was effective as of December 31, 1997. OB's remaining partners were Belgum (60.674 percent), Chen (17.9772 percent), and Wanski (21.3481 percent). Because of the withdrawing partners' breaches of their contract and fiduciary duties, the withdrawing partners forfeited all rights under the partnership agreement no later than December 31, 1997, rendering it unnecessary to calculate the capital accounts of the OB partners as of December 31, 1997, or later.

The arbitrator awarded to OB the following: $561,891 for breach of fiduciary duties against the withdrawing partners; $1,566,733 for intentional interference with OB's business relations against the withdrawing partners, OCMOH, and OCMO; $426,757 for conversion against the withdrawing partners, OCMOH, and OCMO; $27,065 for reimbursement of his legal expenses against Hatton; and $45,701 for their legal fees against the Belgums. The arbitrator awarded the Belgums the following: $2,738,554 for breach of fiduciary duties against the withdrawing partners. The arbitrator awarded Belgum the following punitive damages: $1,177,991 against O'Flaherty; $75,000 against Weber; and $50,000 against Hatton. The arbitrator awarded Theodora the following: $123,502 for deferred compensation and interest. The arbitrator awarded the following attorney fees and costs to be paid by the withdrawing partners, OCMOH, and OCMO: $544,896 to Belgum, including $180,182 for Attorney Morgan's services performed and costs incurred on behalf of Belgum; $79,530 to Marie Belgum; $16,577 to Theodora; and $143,000 to OB for Attorney Morgan's services performed and costs incurred on OB's behalf. The arbitrator also awarded Theodora $16,577 for attorney fees and costs as against OB. The arbitrator ordered the withdrawing partners, OCMOH, and OCMO to pay the administrative fees and expenses of the AAA and the arbitrator. In addition, the arbitrator ordered the withdrawing partners, OCMOH, and OCMO to pay the following in reimbursement of advances made to the AAA: $153,055.60 to OB in reimbursement of amounts advanced on its behalf by the receiver; $4,153.33 to Theodora; and $1,850 to Belgum. He found Chen and Belgum were the duly elected liquidating administrators of OB and ordered the balance of the funds held by the receiver to be disbursed to the liquidating administrators.

*Petitions to Confirm or Vacate the Arbitration Award*

On October 9, 2001, Belgum, Marie Belgum, Chen, and Theodora filed a petition for confirmation of the arbitration award. Attorney Morgan filed a joinder on behalf of OB. Hatton and Dato filed a petition to vacate the arbitration award on the following grounds: the arbitrator's failure to disclose his prior representation by Bird, Marella, as well as circumstances surrounding his separation against the Proskauer law firm, required vacation of the award; neither the partnership agreement nor the law allowed a forfeiture of their rights under the partnership agreement; and the arbitration award adjudicated claims subject to the receivership order. In support of Hatton and Dato's argument that the arbitrator had failed to disclose a relevant life experience, they submitted the arbitrator's deposition against a 1994 case in which the arbitrator had been a plaintiff. Hatton and Dato also submitted the arbitrator's former psychiatrist's deposition testimony against the same case. The withdrawing partners filed several discovery requests. Belgum filed a motion to quash the deposition subpoenas, including subpoenas issued to the AAA, the arbitrator, the arbitrator's former psychiatrist, and the person at

Proskauer most knowledgeable of the circumstances surrounding the arbitrator's separation against the firm. The arbitrator filed a motion for a protective order and an order quashing the discovery demands. Belgum submitted additional excerpts against the psychiatrist's deposition testimony.

On November 28, 2001, a hearing was held on the motions to quash discovery. The trial court found that the arbitrator's separation against Proskauer was too remote and the circumstances had not been shown to be sufficiently relevant life experiences to support further discovery. The trial court quashed the subpoenas related to Proskauer on the grounds of vagueness, overbreadth, relevance, and lack of a showing of good cause. The trial court limited the subpoenas for the depositions of the arbitrator and AAA to (1) Bird, Marella's representation of the arbitrator, including the circumstances of the representation, the communications between the arbitrator and the AAA with Bird, Marella, and the services provided by Bird, Marella; and (2) any appearances by Bird, Marella before the arbitrator against July 1, 1995, either as counsel for a party or as a party. The discovery was conducted.

On December 17, 2001, Weber, Cross, Martinez, Ovando, Thies, Dato, and OCMO filed a petition to vacate the arbitrator's award on the same grounds as Hatton and Dato. They submitted the arbitrator's deposition testimony taken in connection with the motion to vacate the arbitration award. The arbitrator stated that in preparing the disclosure statement for the instant case, he had compared the names of the parties and their counsel with the names in his personal database on his computer. The database may have, but had not necessarily, contained the names of attorneys who had represented him in litigation. He stated that he was not involved in the selection of Attorney LaMothe or Bird, Marella as his counsel in the religious freedom case and did not know how Bird, Marella came to be his counsel. He considered himself to be merely a technical defendant in the case, because the parties' only means to overturn his discovery order was to sue him in his capacity as arbitrator. The arbitrator met with Attorney LaMothe at his home for an hour in connection with the case. He did not remember telephone conversations or written correspondence with Bird, Marella attorneys in connection with the religious freedom case. Bird, Marella later represented the arbitrator in another matter in which he had been served with a subpoena. The arbitrator offered two reasons for failing to disclose his previous relationship with Bird, Marella. He thought Attorney LaMothe worked at the law firm Irell & Manella at the time she represented him. In fact, attorney LaMothe had been a partner at Irell prior to joining Bird, Marella. The second reason was that he considered the religious freedom case inconsequential and did not consider disclosing the representation.

Weber, Cross, Martinez, Ovando, Thies, Dato, and OCMO also submitted the declaration of Bird, Marella Attorney Thomas Reichert, who had worked with Attorney LaMothe. Attorney Reichert declared that between July 12, 1996, and October 25, 1996, he and Attorney LaMothe had four telephone conferences with the arbitrator, met with the arbitrator for an hour and a half meeting at the arbitrator's house, and exchanged seven letters with the arbitrator. On March 10 and 12, 1997, Attorney Reichert had telephone conferences with the arbitrator on the second matter concerning the subpoena and sent him a fax. Weber, Cross, Martinez, Ovando, Thies, Dato, and OCMO also submitted the deposition testimony of AAA vice-president Michael Powell.

After a hearing on January 24, 2002, the trial court took the matter under submission. On April 8, 2002, the trial court issued an order denying the petitions to vacate and confirming the arbitration award. The trial court stated that it had only considered admissible evidence in reaching its decision. The trial court found "that the only argument which has any substance whatsoever is the claim that the [A]rbitrator failed to make certain disclosures." In a footnote, the trial court stated: "The Court has considered and rejected on their merits the other arguments by petitioners. These include, without limitation, that the arbitrator exceeded his powers in various respects; that the amount of the award (including punitive damages), allocation of costs, and the ruling that partnership interests were forfeited were contrary to law or rendered against the evidence; that procedural irregularities occurred in the representation of [OB], and the allowing or exclusion of various elements of evidence . . . ."

The trial court made the following findings as to the arbitrator's failure to disclose his prior representation by Bird, Marella: "The credible evidence clearly demonstrates that when [the arbitrator] was served in early July 1996 [with the complaint in the religious freedom case, the arbitrator forwarded it] to the AAA, and the AAA hired Louise LaMothe, Esq., to represent it and [the arbitrator] in that litigation. Although at the time she was hired by the AAA, Ms. LaMothe was with the Bird, Marella firm, the Court credits [the arbitrator's] statement that he did not then mentally associate Ms. LaMothe with that firm. Rather, the Court finds credible [the arbitrator's] statement that he was personally acquainted with Ms. LaMothe as a result of her long tenure with Irell & Manella, her involvement with the Litigation Section of the American Bar Association, and through her association with the AAA, and in 1996 he assumed she was still with Irell & Manella. The Court further credits [the arbitrator's] statement that he only regarded himself as a nominal defendant in that action.

"The Court's conclusion is supported by undisputed facts that only the AAA (and not [the arbitrator]) was involved in selecting Ms. LaMothe, that [the arbitrator] was never billed for her services, [the arbitrator] did not

execute a retainer agreement, and the contacts between [the arbitrator] and counsel were both minor in nature and very brief in duration, the [religious freedom lawsuit] being dismissed in October 1996 without [the arbitrator] being required to appear or sign court documents. Additional facts supporting this conclusion are the circumstance that [the arbitrator] had then been an arbitrator for a number of years, and Ms. LaMothe's move against Irell & Manella to Bird, Marella was after he left the practice of law. Finally, the Court notes that [Code of Civil Procedure section] 1281.6 did not require disclosure of an attorney/client relationship between an arbitrator and a party or a lawyer for a party until January 1, 1998, so there was no reason for [the arbitrator] to have made a special note of this relationship or to have entered this information into a mandatory database at the time the relationship existed. The Court finds that at the time he made his disclosure, [the arbitrator] was not knowingly or deliberately suppressing information as to this prior relationship.

"A second asserted representation by Ms. LaMothe arose in or about March 1997, after a deposition subpoena was served on [the arbitrator in the second case]. This apparently was a proceeding to confirm or to vacate an arbitration award made by [the arbitrator]. [The arbitrator] referred the matter to the AAA, whose Associate General Counsel in New York first wrote the respondent's counsel, and then retained Ms. LaMothe. There is no credible evidence of any participation in this matter by [the arbitrator], and his only contact with Bird, Marella appears to have been his being copied on a letter against Thomas Reichart at Bird, Marella to the attorney for the party noticing the deposition, reciting their agreement that the deposition would not be taken. If indeed [the arbitrator] could have been considered a client of Bird, Marella (as opposed to the AAA being the client, an issue as to which there is no evidence before the Court), the representation was utterly insubstantial." The trial court was not persuaded that the failure to disclose the representation required vacating the award and found no person apprised of the facts could reasonably question the arbitrator's ability to be impartial on the basis of the relationship in either matter.

As to the parties' arguments that the arbitrator should have disclosed all the circumstances surrounding his departure against Proskauer in 1989, the trial court found the speculation that the arbitrator was involuntarily terminated against the firm and so traumatized by the experience that he was biased in favor of anyone claiming to have been improperly expelled against a law firm was not supported by any admissible evidence. The trial court stated that the order quashing the subpoenas addressed to Proskauer was justified because the extreme overbreadth of the subpoenas made it clear they were a "fishing expedition" to impermissibly intrude into areas protected by the arbitrator's right of privacy. The trial court concluded no disclosure was necessary of the circumstances surrounding the arbitrator's separation against Proskauer and

the award could not be vacated on that basis. "On the evidence before the Court, the Court is persuaded that no person aware that (by hypothesis) [the arbitrator] had been disappointed about having to leave Proskauer Rose a decade before, would reasonably entertain a doubt whether [the arbitrator] would be able to be impartial in this matter. The Proskauer Rose events are too remote temporally, and there is no demonstrated similarity between [the arbitrator and Mr. Belgum's] situations."

*Post-confirmation Proceedings*

O'Flaherty filed a motion for reconsideration of the order assessing punitive damages against him, and Weber and Hatton joined in the motion. Hatton also filed a motion for reconsideration of the order confirming the arbitration award and the order denying discovery as to the circumstances surrounding the arbitrator's departure against Proskauer based upon newly acquired facts. Hatton submitted Attorney Steven Stein's declaration in which Attorney Stein stated that he had been a partner at Proskauer at the time the arbitrator joined the firm. The arbitrator had been considered for a position as a three-year "contract" partner in the litigation department. Under the terms of the contract, the arbitrator would be designated as a "partner," but would not be an equity partner during this period. At the end of the three-year period, the firm agreed to a one-year extension of the contract status. At the end of that year, the partners voted not to elect the arbitrator to equity partnership. The arbitrator left the firm.

On April 19, 2002, Chen filed a motion to terminate the receivership and surcharge the receiver for losses sustained by the receivership estate. The receiver filed a response to the motion to terminate and an opposition to the surcharge. Among other responses, the receiver argued that the payments he had made against the receivership estate were authorized and directed by the receivership court. He argued that the arbitrator's findings that the partners effectively withdrew in December 1997 and placed the partnership in receivership, based on false representations could not make the receiver personally liable for payments. Chen filed a reply to the receiver's opposition. Chen argued that looking to the receiver was the only viable opportunity for the receivership estate to recoup "the $1.8 million deficiency resulting against receiver Ray's mismanagement of receivership estate funds."

On May 13, 2002, a hearing was held on the motions for reconsideration. The trial court took the matter under submission.

On May 15, 2002, a hearing was held on the motion to terminate the receivership. The receivership court granted the motion to terminate the receivership and continued the motion to surcharge the receiver in his

personal capacity. The receiver was ordered to file and serve his final account. He filed his account on July 30, 2002. As a result of the claims procedure, he had received claims totaling $16,019,008. He had received a total of $3,697,964.13 against all sources and disbursed $3,420,229.22. The disbursements included $437,812 for the receiver's fees and expenses and $126,275.50 for the receiver's attorney fees. He had a balance of $277,734. Concerning partnership tax returns, the receiver stated in pertinent part: "The Arbitration Award has created assets to the [OB] partnership, namely judgments in favor of the partnership against various former partners, which would have to be collected and distributed before a final tax return can be prepared and filed." In a footnote, the receiver added: "Since the receiver will be filing his final account and report and disbursing any remaining funds in his possession to the Liquidating Administrator of [OB], the primary responsibility for preparing the 2002 return remains with the [OB] partners as well as the final return." The receiver requested an order instructing him concerning any remaining fund or collateral.

On August 27, 2002, the receivership court heard the motion to surcharge the receiver in his personal capacity. The receivership court stated: "One of the issues that . . . I think is an important issue to deal with is . . . the issue of [the receiver] objecting to Mr. Morgan's representation of [OB] in the arbitration on the basis that only the receiver was authorized to represent [OB]. [¶] . . . One of the grounds for [the] surcharge motion is that the receiver was taking a position that was not in the interests of the estate when he would not agree or authorize Mr. Morgan to represent [OB] in the arbitration. And of course the matter came before the court. After that[,] it came before the court on the petition of the receiver for instructions as to whether the receiver should intervene in the arbitration, hire counsel and have [OB] represented through the receiver in the arbitration proceeding. [¶] . . . And this court instructed the receiver and . . . denied the intervention by the receiver, himself. . . . [A]t that point on the eve of the hearings, number one, there would have been tremendous delays, tremendous additional expense, and the court was not going to at that point instruct the receiver and allow the receiver to intervene, bring in new lawyers, and proceed with [OB] as a party to the arbitration. [¶] . . . [T]he question that is coming in my mind as I'm reading these papers is whether this court should not, and what is there that would preclude it against ordering, for example, nunc pro tunc ratification of Mr. Morgan's representation of [OB] as a party, and in essence eliminating that whole issue against this picture." The receivership court stated that it had not considered ratification in the previous hearing because no one had raised the issue and the issue had not been before it.

The receiver responded that he had not hired or been willing to hire Attorney Morgan because of Attorney Morgan's conflict of interest based on his representation of one of the parties. In addition, the receiver stated that

the trial court's arbitration order had not ordered OB to be a party. Hatton argued that nunc pro tunc authorization of an attorney to represent the receivership estate who had also advocated on behalf of a party did not give him as the opposing party the opportunity to object; it endorsed the representation based on the outcome of the arbitration. The receivership court noted that the arbitration was the significant forum. The receivership was ancillary to the arbitration and intended to ensure that no party took advantage of another while the arbitration took place. Belgum's attorney embraced the receivership court's suggestion and characterized ratification as making explicit a situation, which had previously been implicit. He stated that ratification would be consistent with the receivership court's prior ruling and with the manner in which the proceedings had been conducted. It would also be consistent with the arbitrator's and the trial court's rulings.

In response to argument that the receiver had failed to pursue OB's claims, the receivership court stated: "[M]y view of receiverships is that the receiver, if reasonable, should avoid suing any party to the lawsuit because as soon as he does that he immediately becomes in an antagonistic position to one or the other partner or whoever is involved. [¶] And so I have at times in fact refused—or at least I can think of one issue where the issue was raised, and I did not think that it was at all to the benefit of the estate for the receiver on behalf of the estate to sue the parties and so on. And I might very well have felt the same way in 1998, when you say he should have done this. [¶] . . . And the same thing in '99, 2000 and so on." Hatton objected that the issue was jurisdictional and could not be solved by a nunc pro tunc order. The receivership court continued the hearing to allow the parties to brief whether the receivership court should exercise its equitable power and order the receiver to nunc pro tunc authorize or ratify Attorney Morgan's actions.

On August 29, 2002, the trial court issued an order denying the motions for reconsideration concerning the punitive damages award. On the motion for reconsideration based on newly discovered evidence, the trial court found that even if reconsideration were granted, the admissible evidence against Attorney Stein's declaration did not persuade the trial court to change its decision. Therefore, the trial court granted the motion for reconsideration, but reaffirmed its original decision.

A hearing was held on September 23, 2002, in the receivership court. The receivership court found that the receiver at all times had acted in good faith, reasonably pursuant to the terms of the order appointing him and in accordance with the instructions given with respect to specific actions where there were motions for instructions filed. The motion to surcharge the receiver was denied. The receivership court also approved the final accounting and report. The receivership court ordered the receiver to turn over to Chen and Belgum

as liquidating administrators under the arbitration award all funds on hand other than an estimated amount for finalizing administrative matters. The receivership court stated: "It seems to me that the receivership here was intended to be for one basic purpose, to maintain the status quo in terms of such funds as were available at the time and such funds as might be collected not being spent by anybody for purposes or reasons other than the partnership purposes. [¶] . . . [M]y understanding and sense of this is that the receiver was to wind up things and was not really intended to get involved in litigation with partners on either side, and so it's this court's view that it was for the arbitrator to decide who the parties at the arbitration were going to be, in the first instance; who they could be represented by. [¶] If there were going to be motions to disqualify because of conflicts or otherwise, I suppose those should have been made to the arbitrator and should have been ruled by him if made."

The withdrawing partners argued that the order appointing the receiver explicitly granted a broader scope of powers. The receivership court asked if a motion had been made to the arbitrator to the effect that Attorney Morgan could not represent OB. The withdrawing partners stated that it had. The receivership court stated: "Then, in that case, it's in the record, and the Court of Appeals will review it, and the Court of Appeals will deal with it." The withdrawing partners argued that it was a fundamental jurisdictional problem. The receivership court stated: "This was supposed to be auxiliary to the arbitration. The arbitration was intended to decide all disputes between [the] partners, and it was up to the arbitrator to decide also whether or not that extends to between partners and the partnership, and he decided it is." The receivership court added: "I am not going to at this point now say the [arbitrator] couldn't do what he did. I'm not going to say one way or another. That's now going to be for the Court of Appeals to decide." The receivership court stated that it was not going to issue a nunc pro tunc order approving Attorney Morgan's representation of OB, as the receivership court did not find that appropriate. The withdrawing partners noted that the order appointing the receiver gave him the right to institute actions on behalf of the receivership estate. The receivership court replied: "But he didn't and hasn't and when he wanted to, I told him not to. [¶] [Attorney for the withdrawing partners]: Exactly. But the point [is], that was your decision to make with respect to the receivership and not for Mr. Morgan to come in sua sponte and say, I am representing [OB], and therefore, I am the one who should prosecute this case where there is no authority, and Your Honor—[¶] [The Court]: You can argue that to the Court of Appeals when you seek to reverse the arbitration decision. I'm not going to rule on that. [¶] [Attorney for the withdrawing partners]: You're not ruling whether or not he had authority or not? [¶] [The Court]: I'm not ruling one way or another on that. That's really not an issue before me."

The withdrawing partners asked for clarification as to whether the receivership court was ruling that it did not have power to make a nunc pro tunc order. The receivership court replied: "I'm saying there's no power because I don't see any, really, basis for it. Just because I have jurisdiction over a receiver, I don't think I can go back and make all kinds of orders, number one. [¶] Number 2, in terms of equity and what is before me, . . . I am not going to do it as a matter of discretion as well. [¶] So even if I had power and it was a question of discretion, I wouldn't do it. [¶] [Attorney for the withdrawing partners]: You would not approve the appointment of—[¶] [The Court]: I would not approve or disapprove. I think it is for the arbitrator to decide, and if I really had to do it, I probably would approve. [¶] . . . I'm telling you I'm not doing it because it's not before me in any case." Belgum's attorney stated: "These issues were extensively argued to the arbitrator, and he ruled. [¶] These issues were extensively argued to [the trial court] and he ruled. The court is entirely correct in saying the record has been made on this issue already, and the court's tentative is appropriate."

On October 8, 2002, the receivership court entered its order denying the motion to surcharge the receiver and granting the motion to terminate the receivership proceeding. The receivership court noted that the arbitration award had been entered and provided for liquidating administrators. The receivership court approved the receiver's final account. The receivership court directed the receiver to wind up the administration of the receivership proceedings, including turning over all files to the liquidating administrators. The receivership court ordered the receiver not to pay Theodora's claim against the receivership estate funds, because the claim was subject to the arbitration and the responsibility of the liquidating administrators. After payment of receivership expenses, the receiver was ordered to turn over all remaining funds in his possession to the liquidating administrators. Any outstanding receivership expenses and obligations which were unknown to the receiver were to be paid by the liquidating administrators, plaintiffs, and defendants. The receiver was discharged against all further duties, liabilities, and responsibilities. The receivership court retained jurisdiction over the matter. The receivership court authorized and instructed the receiver to return to the receivership court for a determination of any claim pertaining to the receivership that the parties could not agree as to the proper disposition.

On September 25, 2002, the trial court entered judgment on the arbitration award as follows: "1. [Belgum and Marie Belgum recover against O'Flaherty, Weber, Hatton, Theis, Dato, Cross, Ovando, and Martinez,] jointly and severally, the sum of [$2,738,554]; [¶] 2. [OB recover against O'Flaherty, Weber, Hatton, Theis, Dato, Cross, Ovando, and Martinez], jointly and severally, the sum of [$2,555,381, $142,000] as attorneys' fees, and [$154,055.60] as costs, totaling $2,851,436.60; [¶] 3. [Belgum] recovers as punitive damages: [¶] a. against [O'Flaherty] the sum of [$1,177,991]; [¶]

b. against [Weber] the sum of [$75,000]; and [¶] c. against [Hatton] the sum of [$50,000]; [¶] 4. [OB recovers] against [Hatton] the sum of [$27,065]; [¶] 5. [OB recovers] against [Belgum and Marie Belgum] the sum of [$45,701]; [¶] 6. [Theodora recovers] against [OB] the sum of [$101,508.23] and interest at 10 percent per annum to August 1, 2001, in the amount of [$21,993.45], for a total recovery of [$123,502]; [¶] 7. [Belgum recovers] against [O'Flaherty, Weber, Hatton, Theis, Dato, Cross, Ovando, and Martinez, and OCMOH and OCMO], jointly and severally, the sum of [503,965] as attorneys' fees and [$42,781] as costs, totaling $546,746; [¶] 8. [Marie Belgum recovers] against [O'Flaherty, Weber, Hatton, Theis, Dato, Cross, Ovando, and Martinez, and OCMOH and OCMO], jointly and severally, the sum of [$77,125] as attorneys' fees and [$2,405] as costs, totaling $79,530; [¶] 9. [Theodora recovers] against [O'Flaherty, Weber, Hatton, Theis, Dato, Cross, Ovando, and Martinez, and OCMOH and OCMO], jointly and severally, the sum of [$11,350] as attorneys' fees and [$9,380.33 as costs], totaling $20,730.33; [¶] 10. [Theodora recovers] against [OB] the sum of [$11,350] as attorneys' fees and [$5,227] as costs, totaling $16,577; [¶] 11. Pre-judgment interest is awarded at ten percent (10%) per annum against September 24, 2001[,] until the date of entry of the judgment; and [¶] 12. All sums awarded herein shall bear interest at the rate of ten percent (10%) per annum until paid in full. [¶] 13. The Award, attached hereto as Exhibit 'A,' is incorporated by reference. [¶] 14. Prevailing parties, who are [Belgum, Marie Belgum, OB, and Theodora], shall recover their costs. [O'Flaherty, Weber, Hatton, Theis, Dato, Cross, Ovando, and Martinez, OCMOH, and OCMO] are the losing parties to this judicial proceeding."

The withdrawing partners, OCMOH, and OCMO filed a timely notice of appeal against the judgment.

## DISCUSSION

### I.  *Review of Arbitration Awards Generally*

"[T]he grounds for judicial review of a contractual arbitration award are extremely limited." (*Reed v. Mutual Service Corp.* (2003) 106 Cal.App.4th 1359, 1365 [131 Cal.Rptr.2d 524].) "The arbitrator's decision should be the end, not the beginning, of the dispute." (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 10.) "Courts may not review the merits of the controversy, the validity of the arbitrator's reasoning, or the sufficiency of the evidence. [Citation.] Indeed, an arbitrator's decision is not generally reviewable for errors of fact or law, even if the error appears on the face of the award and causes substantial injustice." (*Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 443 [123 Cal.Rptr.2d 122].) "[I]t is the general rule that, with narrow exceptions, an arbitrator's decision cannot be reviewed for

errors of fact or law." (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 11.) " 'In other words, it is within the power of the arbitrator to make a mistake either legally or factually. . . .' [Citation.]" (*Id.* at p. 12.) "Indeed, even 'an error of law apparent on the face of the award that causes substantial injustice does not provide grounds for judicial review.' [Citation.]" (*Reed v. Mutual Service Corp., supra,* 106 Cal.App.4th at p. 1365.) These rules vindicate the intentions of the parties that the award be final and support the strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution. (*California Faculty Assn. v. Superior Court* (1998) 63 Cal.App.4th 935, 944 [75 Cal.Rptr.2d 1].) Consequently, courts will indulge every intendment to give effect to arbitration proceedings. (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 9.) An award reached by an arbitrator pursuant to a contractual agreement to arbitrate is not subject to judicial review except on the grounds set forth in Code of Civil Procedure sections 1286.2 (to vacate) and 1286.6 (for correction.). (*Moncharsh, supra,* at p. 33.)

## II. *Extent of Arbitrator's Powers*

As noted above, Code of Civil Procedure section 1286.2 sets forth the grounds for vacation of an arbitration award. (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 12.) One of the grounds for which the court "shall vacate the award" is if the court determines that "[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (Code Civ. Proc., § 1286.2, subd. (a)(4) [former subd. (d)].) "In determining whether an arbitrator exceeded his powers, we review the trial court's decision de novo, but we must give substantial deference to the arbitrator's own assessment of his contractual authority." (*Jordan v. Department of Motor Vehicles, supra,* 100 Cal.App.4th at pp. 443–444.)

An arbitrator exceeds his powers when he acts in a manner not authorized by the contract or by law. (*Jordan v. Department of Motor Vehicles, supra,* 100 Cal.App.4th at p. 443.) The scope of arbitration is a matter of agreement between the parties. (*Moncharsh v. Heily & Blase, supra,* 2 Cal.4th at p. 8.) Parties are free to fashion agreements that restrict the arbitrator's authority. (*California Faculty Assn. v. Superior Court, supra,* 63 Cal.App.4th at p. 944.) The powers of arbitrators derive against, and are limited by, the agreement to arbitrate. (*Jordan v. Department of Motor Vehicles, supra,* 100 Cal.App.4th at p. 444.) Therefore, although the deference due an arbitrator's decision on the merits of the controversy requires the court to refrain against substituting its judgment for the arbitrator's in determining the contractual scope of the arbitrator's power, the court is bound to uphold the parties' express agreement to restrict or limit that authority. (*Ibid*; *California Faculty Assn. v. Superior Court, supra,* 63 Cal.App.4th at p. 944.)

A. *Ability to Adjudicate OB's Claims*

Appellants contend the arbitrator exceeded his powers by adjudicating the claims of a party over which he did not have jurisdiction. Specifically, they contend OB's claims were part of the receivership estate, the receiver was the only party who could pursue relief on OB's behalf, the receiver did not and could not authorize Attorney Morgan to prosecute OB's claims, and OB could not pursue the claims in its own name. Therefore, they argue, the arbitrator exceeded his powers by adjudicating OB's claims based on Attorney Morgan's representation of OB and issuing an award in favor of OB. I agree. However, I conclude that the issue is moot and appellants suffered no prejudice, because the receivership has been terminated, the receiver discharged, and the remaining partnership assets turned over to the liquidating administrators.

1. *Law of Receivership*

"In California, a receiver may not be appointed except in the classes of cases expressly set forth in the statutes or as authorized under established usage of the court's equitable powers." (Zebrowski et al., Cal. Prejudgment Money Remedies (1998) § 4.6, pp. 478–479; *Marsch v. Williams* (1994) 23 Cal.App.4th 238, 245–246 [28 Cal.Rptr.2d 402]; *Turner v. Superior Court* (1977) 72 Cal.App.3d 804, 811–812 [140 Cal.Rptr. 475]; 6 Witkin, Cal. Procedure (4th ed. 1997) Provisional Remedies, § 420, p. 341.) "A receivership pending suit is a provisional, *equitable* remedy." (Ahart, Cal. Practice Guide: Enforcing Judgments and Debts (The Rutter Group 2003) ¶ 4:850, p. 4-157.) The court may appoint a receiver in an action which is pending between partners or others jointly interested in any property or fund on the application of any party whose right to or interest in the property or fund or proceeds thereof is probable and where it is shown that the property or fund is in danger of being lost, removed, or materially injured. (Code Civ. Proc., § 564, subd. (b)(1).) A receiver may also be appointed by the court in which the action is pending in all other cases "where necessary to preserve the property or rights of any party." (*Id.,* subd. (b)(9).) The appointment of a receiver rests largely in the discretion of the trial court. (Zebrowski et al., *supra,* § 4.4, pp. 477–478.) An arbitrator is not authorized by statute to appoint a receiver and may not appoint a nonstatutory receiver. (*Marsch v. Williams, supra,* 23 Cal.App.4th at pp. 246–248.)

"The receiver is the agent of the court and not of any party, and as such: [¶] (1) Is neutral; [¶] (2) Acts for the benefit of all who may have an interest in the receivership property; and [¶] (3) Holds assets for the court and not for the plaintiff or the defendant." (Cal. Rules of Court, rule 1903.) "A receiver appointed before judgment manages the subject property during the pendency

of the action for purposes of preserving the property for the benefit of all interested parties, pending a final order in the underlying litigation as to the ultimate disposition of the property." (Zebrowski et al., *supra*, § 4.3, p. 477.) "A receiver in possession of real property stands in the shoes of the owner and has a duty to maintain the property in the same manner as would the owner." (*Vitug v. Griffin* (1989) 214 Cal.App.3d 488, 496 [262 Cal.Rptr. 588].)

Once a receiver has been appointed, an adverse party may (1) bring a motion to vacate or modify the order appointing the receiver; (2) petition the court for an order directing the receiver to take specific acts; (3) seek substitution of a more acceptable receiver; (4) seek removal of the receiver and termination of the receivership; (5) appeal the order appointing the receiver; or (6) proceed on the receiver's bond for damages. (2A Lambden et al., Cal. Civil Practice (2000) ch. 16, § 16:163, pp. 237–238.) "The grounds for a motion to vacate [an order appointing a receiver] are that the order appointing the receiver is void or that the appointment is unwarranted." (Zebrowski et al., *supra*, § 4.28, p. 491; 6 Witkin, Cal. Procedure *supra*, § 445, pp. 358–359.) If the order appointing the receiver is void for any reason, such as that the case is not within the statutory classes or the appointment is otherwise in excess of the court's jurisdiction, the order is subject to collateral as well as direct attack. (Zebrowski et al., *supra*, § 4.30, p. 493; 6 Witkin, *supra*, Cal. Procedure § 446, p. 359.) "If there is a defect in a receiver's acts, or mismanagement of collateral, a party can object, or move for surcharge or for the receiver's discharge." (2A Lambden et al., *supra*, ch. 16, § 16:163, p. 237.)

"The powers of a receiver are framed by the order appointing the receiver, by applicable statute, and by subsequent court orders." (Zebrowski et al., *supra*, § 4.31, p. 493; 6 Witkin, Cal. Procedure *supra*, § 447, p. 360.) Receivers are granted several general powers by statute, including the power to bring and defend actions as receiver; to take and keep possession of the property; and to collect and compromise debts. (Zebrowski et al., *supra*, § 4.31, pp. 493–494.) "A receiver may sue or be sued only by permission of the court." (6 Witkin, Cal. Procedure *supra*, § 448, pp. 360–361.) However, the failure to obtain permission to sue the receiver is not jurisdictional and may be cured at any stage of the proceedings. (*Ibid.*) Moreover, the objection that permission has not been obtained is a plea in abatement that must be raised at the earliest opportunity or is waived. (*Ibid.*) "A receiver must not employ an attorney without the approval of the court. The application for approval to employ an attorney must be in writing and must state the necessity for the employment, the name of the attorney whom the receiver proposes to employ, and that the attorney is not the attorney for, associated with, nor employed by an attorney for any party." (Cal. Rules of Court, former rule 353(b), now rule 1904; Zebrowski et al., *supra*, § 4.35, p. 496.)

"A receivership terminates upon completion of the duties for which the receiver was appointed; or at any other time upon court order." (Ahart, Cal. Practice Guide, *supra*, ¶ 4:940, p. 4.170.9.) "However, termination of a receivership does not relieve the receiver of his or her duties. To be relieved of such duties, a receiver must be discharged by court order." (Zebrowski et al., *supra*, § 4.39, p. 497.) "The receiver must make a final report and accounting and make all final disbursements. The court approves the final accounting, including compensation for the receiver, and makes the order of discharge." (2A Lambden et al., *supra*, ch. 16, § 16:162, p. 236.) "A receiver has no official duties and is not a proper party to any action after being discharged by the court. The discharge order operates as res judicata as to any claims of liability by parties to the receivership against a receiver in his or her official capacity[.]" *(Ibid.; Vitug v. Griffin, supra,* 214 Cal.App.3d at p. 494.) The propriety of the receiver's appointment becomes moot and not subject to review after the discharge of the receiver. (6 Witkin, *supra*, Cal. Procedure, § 445, p. 358.)

"The appointing court has custody over all property in the receiver's possession and has plenary jurisdiction to resolve disputes concerning such property. Thus, only the court may authorize a transfer or encumbrance of the property." (Ahart, Cal. Practice Guide *supra*, § 4:937, p. 4-170.8.)

## 2. *Receiver as Real Party in Interest*

Except as otherwise provided by statute, every action must be prosecuted in the name of the real party in interest. (*Cloud v. Northrop Grumman Corp.* (1998) 67 Cal.App.4th 995, 1004 [79 Cal.Rptr.2d 544].) "Generally, the real party in interest is the person who has the right to sue under the substantive law. It is the person who owns or holds title to the claim or property involved, as opposed to others who may be interested or benefited by the litigation. [Citation.] [¶] Real party in interest issues are often discussed in terms of plaintiff's 'standing to sue.' [Citation.]" (Weil and Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2003) ¶ 2:2, pp. 2-1 to 2-2, italics omitted.) "The purpose of the real party in interest requirement is to assure that any judgment rendered will bar the owner of the claim sued upon against relitigating. 'It is to save a defendant, against whom a judgment may be obtained, against further harassment or vexation at the hands of some other claimant to the same demand.' [Citations.]" (*Id.,* ¶ 2:4, p. 2-2.)

"[In general, the] partnership entity is the owner of partnership property and the real party in interest on claims for damage to partnership property. Individual partners may not sue for damage to the partnership property or to their individual 'beneficial interest' in the property." (Weil and Brown, Cal. Practice Guide, *supra*, ¶ 2:15.5, pp. 2-8 to 2-9.)

"An estate or trust is not a legal entity, and therefore has neither capacity nor standing to sue[.] Title to estate or trust assets is held by the executor, administrator or trustee, on behalf of the beneficiaries. Thus, as to claims held by an estate or trust, the executor, administrator or trustee is the real party in interest. Such fiduciary has the right to sue[.]" (Weil and Brown, Cal. Practice Guide, *supra,* ¶ 2:6, p. 2-2, italics omitted.) "A receiver occupies a position generally analogous to that held by an executor in the law of probate or by a trustee in the law of bankruptcy. Although appointed by the testator, a probate executor is an officer of the court, charged with the duty of managing, marshalling, and protecting the estate property during the pendency of a legal proceeding, subject to the continuing control of the court. [Citations.] Executors are fiduciaries, 'with the usual obligations and liabilities of trustees in the broad sense of the term' towards all persons having an interest in the estate. [Citations.] The executor is subject to surcharge or removal for failure to perform his or her obligations. [Citations.]" (*Shannon v. Superior Court* (1990) 217 Cal.App.3d 986, 993 [266 Cal.Rptr. 242].) "All causes of action belonging to a bankrupt at the time of filing a Chapter 7 bankruptcy petition (liquidation) become part of the bankruptcy estate. The trustee in bankruptcy therefore is the real party in interest as to such causes of action (unless the trustee chooses to abandon them)." (Weil and Brown, Cal. Practice Guide, *supra,* ¶ 2:7, p. 2-4.)

"[A] complaint filed by a party who lacks standing is subject to demurrer. [Citation.] The rationale for such a demurrer is generally stated to be that a complaint by a party lacking standing fails to state a cause of action by the particular named plaintiff, inasmuch as the claim belongs to somebody else. [Citation.] A more accurately stated rationale would be that there is a defect in the parties, since the party named as plaintiff is not the real party in interest." (*Cloud v. Northrop Grumman Corp., supra,* 67 Cal.App.4th at p. 1004, fn. omitted.) "Plaintiff's lack of standing to sue on the claim is treated as a 'jurisdictional' defect and is not waived by defendant's failure to raise it by demurrer or answer: '(C)ontentions based on a lack of standing involve jurisdictional challenges and may be raised at any time in the proceeding.' " (Weil and Brown, Cal. Practice Guide, *supra,* ¶ 2:78, p. 2-21, italics omitted.) "Lack of standing negates existence of a cause of action and is not waived by failure to object; it can even be raised for the first time on appeal." (*Id.,* ¶ 2:81.1, p. 2-22.)

"When a party lacks standing to sue, the action must be dismissed, unless the complaint can be amended by substituting a party who has standing." (Weil and Brown, Cal. Practice Guide, *supra,* ¶ 2:79, pp. 2-21 to 2-22.) "[I]f the facts of the cause of action against the defendant would not be 'wholly different' after amendment, a complaint filed by a party without standing may be amended to substitute in the real party in interest." (*Cloud v. Northrop*

*Grumman Corp., supra,* 67 Cal.App.4th at p. 1005.) " ' "[A] suit is some-times brought by a plaintiff without the right or authority to sue, and the amendment seeks to substitute the real party in interest. Although the original complaint does not state a cause of action *in the plaintiff,* the amended complaint by the right party restates the identical cause of action, and amendment is freely allowed." ' " (*Id.* at pp. 1004–1005.)

### 3. *Effect of Order Discharging Receiver*

"The court must, in every stage of an action, disregard any error, improper ruling, instruction, or defect, in the pleadings or proceedings which, in the opinion of said court, does not affect the substantial rights of the parties. No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear against the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown." (Code Civ. Proc., § 475.) A person who is winding up a partnership's business may prosecute and defend actions and proceedings, settle and close the partnership's busi-ness, settle disputes by mediation or arbitration, and perform "other necessary acts." (Booke et al., Advising Cal. Partnerships (Cont.Ed.Bar 3d ed. 1999) Dissolving and Winding Up Partnership, § 16.21, pp. 621–622.)

In this case, the receiver was appointed for all of OB's property and given the power to institute and prosecute, in his own name as receiver, lawsuits for the enforcement and recovery of obligations due to OB. Any claims OB had against individual partners became assets of the receivership estate. At the time of the arbitration proceedings, OB's claims were assets of the receiver-ship estate and Attorney Morgan had no standing to pursue the claims in the arbitration proceedings in the name of the partnership. The danger to appellants was that the arbitration proceedings would not be binding as to the receiver and would not bar the receiver against pursuing the same claims in a subsequent action. Had the receiver concluded the receivership estate was entitled to greater damages and he could obtain a more favorable award, he could have relitigated OB's claims. However, the receivership court termi-nated the receivership, discharged the receiver, and transferred the ability to prosecute OB's claims to the liquidating administrators. OB's claims may now be pursued in the name of the partnership and the party that prosecuted OB's claims in arbitration is now the party authorized to pursue those claims. Appellants are no longer in jeopardy of relitigation.

To the extent appellants contend an attorney without a conflict of interest would have prosecuted OB's claims against the remaining partners more vigorously and obtained a greater recovery for OB, there has been no harm to the withdrawing partners. The arbitrator found that the remaining partners were entitled to share in OB's assets after liquidation and the withdrawing partners had no right to a return of their capital accounts against OB's assets. Had a neutral representative prosecuted OB's claims against the remaining partners more vigorously and obtained greater recovery for OB, the additional funds would simply have been divided and returned to the remaining partners. None of the funds would have benefited the withdrawing partners. The withdrawing partners were not harmed by any failure to more vigorously prosecute OB's claims against the remaining partners.

Even were this court to vacate the provisions of the judgment in favor of OB on the ground that OB was not the real party in interest in the arbitration proceeding, the party who pursued the claims without authorization in the first arbitration proceeding would now be authorized to pursue the claims on OB's behalf. No benefit would be gained by reversing the award. The withdrawing partners had actual notice of the claims of OB and ample opportunity to oppose the claims in the arbitration proceedings.

Both the trial court and the receivership court accepted and implicitly ratified the arbitration award in favor of OB. The courts concluded that the arbitration was the proper forum for resolution of the partnership issues. OB's claims were fully litigated by all parties. Receivership is an equitable remedy. The receivership court stated that if the issue of ratification of the award in favor of OB had been before the receivership court, it probably would have ratified the award and accepted the benefits for the receivership estate. Reversal is not warranted.

B.   *Award Was Authorized*

As stated above, an arbitration award may be vacated if the arbitrator acted in a manner that is not authorized by contract or by law. In this case, the partnership agreement provided for the arbitrator's authority as follows: "The arbitrator shall not have any power to alter, amend, modify or change any terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, nor to grant any remedy which is either prohibited by the terms of the Agreement, or not available in a court of law." In his final award, the arbitrator denied appellants' request for an accounting of their capital accounts on the theory that appellants' multiple flagrant breaches of their contractual and fiduciary duties forfeited their rights under the partnership agreement. Appellants contend forfeiture of their capital accounts was not a remedy available in a court of law. Appellants also contend forfeiture was not authorized by the contract. I disagree.

### 1. *Authorized by Law*

Appellants contend that forfeiture of a partner's interest is not a remedy available in partnership disputes in a court of law. Therefore, they contend, the arbitrator was not authorized by the contract or by law to deny their request for an accounting. I would conclude that equitable defenses may be applied to defeat the statutory right to a partnership accounting.

Under the Corporations Code section 16807, subdivision (b), "[e]ach partner is entitled to a settlement of all partnership accounts upon winding up the partnership business. . . . The partnership shall make a distribution to a partner in an amount equal to any excess of the credits over the charges in the partner's account." "A partner who wrongfully dissociates is liable to the partnership and to the other partners for damages caused by the dissociation. The liability is in addition to any other obligation of the partner to the partnership or to the other partners." (Corp. Code, § 16602, subd. (c).) "[A] breach of the partnership agreement does not necessarily result in a forfeiture of the partner's interest or deprive him of his right to an accounting." (*B.K.K. Co. v. Schultz* (1970) 7 Cal.App.3d 786, 797 [86 Cal.Rptr. 760] [defendant's breach of partnership agreement was not a sufficient basis for denying his request for an accounting, and trial court made no other findings of fact which would support any theory divesting defendant of his interest in the business; because appellate court could not determinate whether defendant was refused an accounting on proper factual grounds or upon an erroneous interpretation of law, judgment was reversed and remanded for further proceedings].)

However, although partners have a statutory right to an accounting, and a partnership is required to make certain distributions upon dissolution, equitable defenses are available to defeat the right to a partnership accounting. (Cf. *Rosenfeld, Meyer & Susman v. Cohen* (1987) 191 Cal.App.3d 1035, 1060–1063 [237 Cal.Rptr. 14] [defense of unclean hands was properly tried and determined even though withdrawing partners had statutory right to demand accounting and remaining partners who received income against unfinished partnership business "must" account to the partnership by statute; conversely, remaining partners' right to an accounting against withdrawing partners for unfinished partnership business was not barred by their bad faith acts and the court declined to decide "what degree of bad faith" by the remaining partners would preclude recovery]; see also *Chapman v. Dunnegan* (Mo.Ct.App. 1984) 665 S.W.2d 643, 647–648 and fn. 6 [unconditional right to an accounting is reflected in mandatory language of Uniform Partnership Act, but equitable defenses under the generic rubric unclean hands may be available if partner failed to perform and adversely affected partnership]; *Carola v. Grogan* (1984) 102 A.D.2d 934, 935 [477 N.Y.S.2d 525] [in dicta states that the doctrine of unclean hands may, arguably, be used to defeat the

right to an accounting, although argument has never been made successfully]; *Paretti v. Cavalier Label Company, Inc.* (S.D.N.Y. 1988) 702 F.Supp. 81 [partners are entitled to an accounting under New York law, but in order to exercise that statutory right, the partner must come to court with clean hands or forfeit his right to an accounting]; *Cohen v Katz* (1997) 242 A.D.2d 448, 448 [662 N.Y.S.2d 40] [the doctrine of unclean hands applies to bar right to partnership accounting].)

A partner's actions in bad faith are relevant to that partner's rights against other partners. (*Rosenfeld, Meyer & Susman v. Cohen, supra,* 191 Cal.App.3d at p. 1061.) "We deal here with a suit for an accounting, an equitable proceeding [citation], to which equitable doctrines are applicable. [Citation.] One of these is the rule that 'he who comes into equity must come with clean hands.' [Citation.] The force of the doctrine in a particular case must depend on the circumstances of that case, and on proof that the misconduct is material to the subject matter of the litigation to which it is a defense. [Citation.]" (*Ibid.*)

The equitable defense of unclean hands "requires inequitable conduct by the plaintiff in connection with the matter in controversy and provides a complete defense to the plaintiff's action." (*Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 446 [99 Cal.Rptr.2d 678].) " '[W]henever a party, who, as *actor*, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine*; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.' [Citation.]" (*Id.* at p. 446, fn. 7.) "The defense of unclean hands does not apply in every instance where the plaintiff has committed some misconduct in connection with the matter in controversy, but applies only where it would be inequitable to grant the plaintiff *any* relief." (*Id.* at pp. 446–447.)[1] Wrongful dissolution of a partnership, in and of itself, does not establish unclean hands and preclude an accounting. (*Thomas v. Marvin E. Jewell & Co.* (1989) 232 Neb. 261, 269 [440 N.W.2d 437]; *Hoppen v. Powell* (Tenn.Ct.App. 1980) 600 S.W.2d 736, 738–739.)

"Modern decisions recognize the defense in legal as well as equitable actions." (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 1052, p. 502.) "A court, discovering the facts of unclean hands, needs no original or amended pleading to justify its refusal to grant relief to the plaintiff. And the defense is, in this respect, more like illegality than laches, for the appellate

---

[1] I note that the equitable right to setoff may also be barred by the equitable defense of unclean hands. (*Margott v. Gem Properties, Inc.* (1973) 34 Cal.App.3d 849, 856 [111 Cal.Rptr. 1]; *Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 750 [38 Cal.Rptr.2d 650, 889 P.2d 970].)

court may deny relief on this ground, without either pleading or action by the trial court." (5 Witkin, *supra*, § 1052, p. 503, italics omitted.) A trial court's decision to grant an equitable defense such as unclean hands is reviewed for abuse of discretion. (*Dickson, Carlson & Campillo v. Pole, supra,* 83 Cal.App.4th at p. 447.)

In this case, although the arbitrator did not expressly use the term "unclean hands" in his award, the arbitrator's findings clearly support his denial of an accounting under that theory. The arbitrator found that: the withdrawing partners' actions constituted "multiple willful, malicious, and fraudulent breaches" of the contractual and fiduciary duties owed to OB and the remaining partners; the withdrawing partners had the specific intent to deny Belgum and OB their existing and prospective interests in order to benefit the withdrawing partners and OCMOH; the withdrawing partners withdrew pursuant to a conspiracy to convert the business and assets of OB and deny Belgum his rightful interest in OB; and as a result, "Because of their flagrant breaches of the Partnership Agreement and breaches of fiduciary duty against [OB and the remaining partners], [the withdrawing partners] forfeited all rights under the Partnership Agreement no later than December 31, 1997. This forfeiture renders unnecessary any calculations regarding the capital accounts of the partners of [OB] as of December 31, 1997 or later." The arbitrator's findings of fact clearly support divestiture of the withdrawing partners' interests in their capital accounts on the theory of unclean hands. The withdrawing partners conspired and attempted to convert OB's assets, including the capital accounts and Belgum's interest, to their own use. The arbitrator concluded that by wrongfully withdrawing against the partnership and willfully taking actions to convert assets of the partnership in flagrant bad faith, the withdrawing partners forfeited any rights they might otherwise have had to claim those assets.

The arbitrator did not expressly rely on the doctrine of unclean hands in the final award. However, the arbitration proceedings were not made part of the record on appeal. Therefore, we do not know the extent to which equitable defenses were raised during the arbitration. We must indulge every intendment to give effect to arbitration proceedings. (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 9.) Moreover, we may not review the merits of the controversy, the validity of the arbitrator's reasoning, or the sufficiency of the evidence. (*Jordan v. Department of Motor Vehicles, supra,* 100 Cal.App.4th at p. 443.) The arbitrator was authorized by law to deny the withdrawing partners an accounting and forfeit their capital accounts. We are permitted no further review of the award on this ground.

## 2. *No Contractual Prohibition*

The partnership agreement provides for compensation to a partner who voluntarily withdraws as follows. Article 12 provides that upon 30 days, notice, a partner who voluntarily withdraws "shall be entitled" to receive deferred compensation pursuant to paragraph 12.3 and "shall be entitled" to the return of his or her capital account pursuant to paragraphs 12.1 and article 16, unless during the 30-day period while the voluntary withdrawal is pending, the partnership gives notice of involuntary termination. The partnership could vote to involuntarily terminate a partner could be involuntarily terminated "for cause," including grievous actions against the partnership, under paragraph 13.2. If the partnership gave proper notice of involuntary termination for cause, the terminated partner "shall be entitled" only to the return of his or her capital account under article 16. Moreover, if a voluntarily withdrawing partner gave notice to any of the clients of the partnership, under paragraph 12.2, the withdrawing partner "shall be entitled only to the amount set forth in Article 16." Appellants contend that the language of the partnership agreement makes the return of their capital accounts mandatory, and therefore, the arbitrator was required to conduct an accounting. I disagree.

The mandatory language of the partnership agreement mirrors the mandatory statutory language that provides partners with a right to an accounting. The same rationale applies equally to this contractual language to allow equitable defenses. Where the party seeking an equitable remedy such as an accounting has acted in bad faith or violated another equitable principle in connection with the transaction, the court may refuse to acknowledge the right to an accounting or provide any remedy. Nothing in the partnership agreement expressly prohibits forfeiture of partnership interest or the application of the defense of unclean hands. In fact, the partnership agreement expressly allows the arbitrator to apply any remedy available in a court of law. I would conclude that the arbitrator was authorized by contract to deny the request for an accounting.

Our ability to review the arbitrator's award ends with our conclusion that the arbitrator was authorized by law and by contract to deny the request for accounting based on equitable principles. It is within the power of the arbitrator to make a mistake either legally or factually, and even an error of law apparent on the face of the award that causes substantial injustice does not provide grounds for judicial review. The refusal to award the withdrawing partners an equitable remedy was within the scope of the arbitrator's powers.

In any event, the arbitrator expressly found that all of the withdrawing partners had negative capital accounts as of the fiscal year end of December

31, 1997.[2] The arbitrator further found that all of the withdrawing partners voluntarily withdrew effective December 31, 1997. The partnership agreement provided that a partner who voluntarily withdrew against the partnership, was entitled to the return of his or her capital account as of the date of the voluntary withdrawal. (Art. 12.) The partnership agreement further provided that a withdrawing partner's capital account was to be computed on a cash basis without adjustment for accounts receivable or work in progress. (Art. 16.) Thus, the withdrawing partners had no capital accounts to which they were entitled as of the effective date of their voluntary withdrawal on December 31, 1997. Accordingly, even were an accounting for capital accounts for any period after December 31, 1997, conducted, it would be of no benefit to any withdrawing partner.

Finally, the arbitrator did not order the capital accounts of the withdrawing partners to be forfeited. The arbitrator ordered that the withdrawing partners had "forfeited all rights under the Partnership Agreement no later than December 31, 1997." The partnership agreement provided that a partner, who voluntarily withdrew and did not contact clients of the partnership, might be entitled to certain "deferred compensation" as defined in the partnership agreement. Here, the withdrawing partners contacted and solicited clients of the partnership and accordingly were not entitled to any deferred compensation. In addition, the partnership agreement provided for certain distributions to the partners upon dissolution of the partnership. The arbitrator found that the withdrawing partners had not effectively dissolved the partnership in 1997, but rather that the partnership was dissolved as of July 31, 1998, when the withdrawing partners were no longer partners. It is apparently the rights to deferred compensation and the proceeds of the dissolution to which the arbitrator was referring when he indicated the withdrawing partners had forfeited their rights under the partnership agreement.

---

[2] "Claimants and Counter-Respondents Michael A. O'Flaherty, John J. Weber, Gregory M. Hatton, Lee M. Thies, Robert M. Dato, Lisa A. Cross, Lynn E. Ovando, and Mike Martinez [the withdrawing partners], Counter-Respondent Nancy J. Wanski, and Respondent and Counter-Respondent Ernest C. Chen are separately liable to Counter-Claimant O'Flaherty & Belgum for the negative balances of their respective capital accounts in O'Flaherty & Belgum as determined pursuant to the Partnership Agreement." (Corrected interim award of Apr. 21, 2001.) "Pursuant to Section 3.3 and Appendix B, Paragraph 11 of the Partnership Agreement, a withdrawing partner with a deficit in his or her capital account, as determined pursuant to the Partnership Agreement, shall reimburse O & B the amount of such deficit balance within 60 days of withdrawing against the partnership. No such payments were made by O'Flaherty, Weber, Hatton, Thies, Dato, Cross, Ovando, and Martinez [the withdrawing partners]." (Final award of Sept. 24, 2001.) To the extent of any ambiguity in the award on the issue of negative capital accounts, this court should construe the award to uphold it.

III. *Arbitrator Bias*

Appellants contend the arbitrator's failure to disclose certain circumstances required vacation of the award. I disagree.

A. *Disclosure Requirements*

Code of Civil Procedure section 1281.9 imposes disclosure requirements on arbitrators. Proposed neutral arbitrators "shall disclose" particular information "in writing within 10 calendar days of service of notice of the proposed nomination or appointment," including "any attorney-client relationship the proposed neutral arbitrator has or had with any party or lawyer for a party to the arbitration proceeding." (Former Code Civ. Proc., § 1281.9, subd. (a)(3).) "For purposes of this section, 'lawyer for a party' includes any lawyer or law firm currently associated in the practice of law with the lawyer hired to represent a party." (*Id.,* former subd. (f).) In addition, "An arbitrator shall disclose to all parties the existence of any grounds specified in [Code of Civil Procedure s]ection 170.1 for disqualification of a judge; and, if any such ground exists, shall disqualify himself or herself upon demand of any party made before the conclusion of the arbitration proceeding." (*Id.,* former subd. (e).) Code of Civil Procedure section 170.1, subdivision (a) provides in pertinent part that a judge shall be disqualified if: "(6) For any reason . . . a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial."

Former subdivision (d) of Code of Civil Procedure section 1281.9 provided that a party who failed to serve a notice of disqualification within 15 days of service of the disclosure statement waived the right to disqualify a proposed neutral arbitrator "unless the proposed nominee or appointee makes a material omission or material misrepresentation in his or her disclosure." However, subdivision (d) also provided: "Nothing in this subdivision shall limit the right of a party to vacate an award pursuant to [Code of Civil Procedure s]ection 1286.2, or to disqualify an arbitrator pursuant to any other law or statute."

Code of Civil Procedure section 1286.2 provided in pertinent part that the court "shall vacate" an arbitration award if the court determines any of the following: "(1) The award was procured by corruption, fraud or other undue means. [¶] (2) There was corruption in any of the arbitrators. [¶] . . . [¶] (6) An arbitrator making the award . . . was subject to disqualification upon grounds specified in Section 1281.91 but failed upon receipt of timely demand to disqualify himself or herself as required by that provision."

In *Michael v. Aetna Life & Casualty Ins. Co.* (2001) 88 Cal.App.4th 925, 936 [106 Cal.Rptr.2d 240], the appellate court found that section 1281.9,

subdivision (e) and section 170.1 subdivision (a)(6)(C) of the Code of Civil Procedure required arbitrators to disclose to parties any reason that might cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial. "Moreover, the statutory test does not require actual bias. Where a reasonable person would entertain doubt whether the appraiser or arbitrator was impartial, the appellate courts are not required to speculate whether bias was actual or merely apparent, or whether impartial consideration of the evidence and dispassionate decision of the matter would have led to the same result." (*Michael v. Aetna Life & Casualty Ins. Co., supra,* 88 Cal.App.4th at p. 937.) The *Michael* court recognized that a court may vacate an arbitration award only if it found that a ground in section 1286.2 existed. (*Michael, supra,* at p. 937.) "We now hold that where an appraiser or arbitrator fails to disclose matters required to be disclosed by section 1281.9, subdivision (e), and a party later discovers disclosure should have been made, that failure to disclose constitutes one form of 'corruption' for purposes of section 1286.2, subdivision (b) and thus provides a ground for vacating an award. This is because the failure to disclose such matters, even if no actual bias is present, represents a kind of 'corruption' by creating the appearance that the appraiser or arbitrator is concealing something important and relevant to his or her impartial participation in the appraisal or arbitration proceeding." (*Id.* at pp. 937–938.)

However, "[a]pplication of the [Code of Civil Procedure] section 1281.9, subdivision (e) disclosure rule does not always require vacation of an arbitration award. [Citation.] The cases must be decided on their facts. [Citations.]" (*Michael v. Aetna Life & Casualty Ins. Co., supra,* 88 Cal.App.4th at p. 938.) An arbitrator must disclose a substantial prior or continuing business relationship with a party or with a party's representative, even if the business activity does not occur during a pending arbitration. (*Id.* at p. 939.) However, "[s]ocial acquaintance, even of long duration and of a personal nature, without a substantial business relationship does not create an impression of possible bias." (*Ibid.*) "Moreover, to create an impression of possible bias that therefore requires disclosure, a business relationship must be substantial and involve financial consideration." (*Id.* at p. 940.) "The party claiming bias bears the burden of establishing facts supporting its position." (*Reed v. Mutual Service Corp., supra,* 106 Cal.App.4th at pp. 1370–1371.)

"[W]hether a particular relationship between an arbitrator/appraiser and a party or party's representative requires disclosure is a factual question to be decided by the trier of fact in each case." (*Michael v. Aetna Life & Casualty Ins. Co., supra,* 88 Cal.App.4th at p. 938.) "The trier of fact determines the factual question whether a particular relationship requires disclosure in each case. [Citations.] This court reviews the trial court's factual findings relating to its vacation of the award according to the substantial evidence rule." (*Id.* at p. 933.)

Senate Bill No. 475 (2001–2002 Reg. Sess.), filed with the Secretary of State on September 27, 2001, amended Code of Civil Procedure sections 1281.9 and 1286.2. Section 1281.9, subdivision (a) now specifically provides in pertinent part: "In any arbitration proceeding pursuant to an arbitration agreement, when a person is to serve as a neutral arbitrator, the proposed neutral arbitrator shall disclose all matter that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial, including all of the following: [¶] . . . [¶] (5) Any attorney-client relationship the proposed neutral arbitrator has or had with any party or lawyer for a party to the arbitration proceeding." Section 1281.91 now contains the provision that the right of a party to disqualify a proposed neutral arbitrator is waived for failure to serve a timely notice of disqualification, unless the proposed arbitrator "makes a material omission or material misrepresentation in his or her disclosure." (Code Civ. Proc., § 1281.91, subd. (c).) Senate Bill No. 475 also added to the grounds for vacation of an award under section 1286.2 that the court shall vacate the award if the court determines the arbitrator making the award "failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware." (Code Civ. Proc., § 1286.2, subd. (a)(6)(A).) Section 8 of Senate Bill No. 475 provides: " 'It is the intent of the Legislature that the grounds for vacatur added by subparagraph (A) paragraph (6) of subdivision (a) of Section 1286.2, is declarative of existing case law which provides that an arbitration award may be vacated when a neutral arbitrator fails to disclose a matter that might cause a reasonable person to question the ability of the arbitrator to conduct the arbitration proceeding impartially.' " (See Historical and Statutory Notes, 19A West's Ann. Code Civ. Proc. (2003 supp.) foll. § 1286.2, p. 105.)

### B. *Bird, Marella*

Appellants contend the arbitrator's failure to disclose that he had previously been represented in two matters by the law firm that represented appellants at the outset of the arbitration proceeding was corruption requiring vacation of the award. However, the trial court's finding that no person apprised of the facts could reasonably question the arbitrator's ability to be impartial on the basis of the relationship in either matter is supported by substantial evidence.

The arbitrator knew Attorney LaMothe in a professional context while he was working as a litigator and she was a partner at Irell. He believed she was still associated with Irell at the time that she represented him. The names of the firms are similar and the confusion understandable. At the time that Bird, Marella represented him, the arbitrator was not required to disclose the names of attorneys and law firms who had represented him and did not have

a reliable system for tracking this information. Therefore, when he compared Bird, Marella to the parties in his database in order to prepare the disclosure statement for the instant arbitration, he did not become aware of his prior relationship to the law firm and the need for disclosure. Because the arbitrator was not aware that he had been represented by Bird, Marella, no reasonable person apprised of the facts could question the arbitrator's ability to be impartial in this matter.

In addition, Bird, Marella's representation of the arbitrator was relatively insignificant. The arbitrator did not arrange or pay for the representation and both matters were concluded quickly. Nothing in the facts concerning Bird, Marella's representation of the arbitrator in either matter would cause a reasonable person to doubt the arbitrator's ability to be impartial in relation to Bird, Marella's representation of the appellants in this case. In addition, Bird, Marella were appellants' attorneys and thus any possible prejudice is extremely unlikely. The trial court's findings are supported by substantial evidence.

### C. *Proskauer*

Appellants contend the evidence concerning the arbitrator's separation against the Proskauer law firm was sufficiently traumatic and similar to the facts of the instant matter that a reasonable person might doubt his ability to be impartial in considering the facts of this law partnership case. Therefore, they contend, the arbitrator's failure to disclose the circumstances surrounding his departure against Proskauer was corruption for which the arbitration award should have been vacated. I disagree. The trial court's finding that the circumstances of the arbitrator's separation against Proskauer would not cause a reasonable person to doubt his ability to be impartial in this matter was supported by substantial evidence.

The arbitrator joined Proskauer on a conditional basis. He was aware that he would have to successfully complete a probationary period. The probationary period was extended for a year and ultimately the firm did not extend an offer to the arbitrator to become an equity partner. Lawyers are often denied partnership and change law firms frequently. The partners at Proskauer took no action toward the arbitrator that they were not entitled to take under their agreement with the arbitrator and by law. The facts of the arbitrator's separation against Proskauer, as presented by the appellants, are not similar to the instant case beyond the bare fact that both involved the decisions of partners in a law firm. In addition, the arbitrator's separation against Proskauer occurred more than 10 years prior to the arbitration proceedings in this matter.

### D. *Discovery*

In connection with the motion to vacate the award, appellants requested discovery concerning the arbitrator's separation against Proskauer, including (1) the deposition of the person most knowledgeable of the facts at Proskauer and an exhaustive request for document production, and (2) the deposition of the arbitrator's psychiatrist. The trial court denied the discovery requests as vague, overbroad, irrelevant, and lacking a showing of good cause. Appellants contend the trial court abused its discretion by denying their requests for discovery related to the arbitrator's separation against Proskauer and request reversal of the judgment in order to conduct discovery into the circumstances surrounding the arbitrator's separation against Proskauer. I would find no abuse of discretion.

Judges have broad discretion in controlling the course of discovery and in making the various decisions necessitated by discovery proceedings. (*Obregon v. Superior Court* (1998) 67 Cal.App.4th 424, 431–432 [79 Cal.Rptr.2d 62].) "The trial judge's application of discretion in discovery matters is presumed correct, and the complaining party must show how and why the court's action constitutes an abuse of discretion in light of the particular circumstances involved." (*Id.* at p. 432.)

Appellants have not shown good cause for further discovery into the circumstances surrounding the arbitrator's separation against Proskauer. None of the evidence or argument suggests the existence of any further relevant information. The trial court did not abuse its discretion in denying the requested discovery.

## IV. *Punitive Damages*

Appellants contend due process requires judicial review of the size and basis for an arbitrator's award of punitive damages. I disagree.

Arbitration is a private proceeding, arranged by contract. (*Rifkind & Sterling, Inc. v. Rifkind* (1994) 28 Cal.App.4th 1282, 1290 [33 Cal.Rptr.2d 828].) "Before its confirmation, the resulting award possessed the legal status of a private contract. [Citation.] Consequently, the arbitration and award themselves were not governed or constrained by due process, including its elements applicable to judicial proceedings to impose punitive damages." (*Id.* at p. 1291.)

In *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 431 [149 L.Ed.2d 674, 121 S.Ct. 1678], cited by appellants, the United States Supreme Court held that the constitutionality of a punitive damages

award is reviewed de novo by the appellate court, rather than under an abuse of discretion standard. However, *Cooper* did not purport to apply to arbitration awards and has no application to the instant case. In any event, it appears the punitive damage awards were in compliance with the guidelines set forth by the United States Supreme Court in *State Farm Mut. Auto Ins. Co. v. Campbell* (2003) 538 U.S. 408 [155 L.Ed.2d 585, 123 S.Ct. 1513].)

## V. *Conclusion*

The partners of a law firm agreed in the partnership agreement to settle their disputes by arbitration. A lengthy and contentious arbitration was conducted before a neutral arbitrator. All issues were presented to the arbitrator. The arbitrator issued a detailed and comprehensive written award. Two judges of the superior court endorsed the arbitration proceedings. The arbitration award was confirmed. Appellants are exceedingly unhappy with the arbitration award confirmed by the trial court. Appellants have gone to extraordinary lengths to overturn the arbitration award. Fixing on two asserted legal errors, the majority finds "manifest injustice" and "a significant economic burden" for appellants. However, in my opinion, neither of the two asserted legal errors justifies vacation of the award. The capital account issue is in my view a complete red herring and in all events a trivial aspect of a complex award of damages. The receiver issue is moot. The arbitration award was in favor of the partnership and the benefits were accepted by the partnership. The receiver has been discharged.

Sadly, six years after the wrongful acts of appellants, the parties must begin resolution of their disputes anew. They may take no comfort against the finality for which they bargained. The arbitrator's decision in this case is, unfortunately, the beginning, and not the end, of this dispute. (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 10.)

For all of the foregoing reasons, I would affirm.

Petitions for a rehearing were denied February 26, 2004, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied April 14, 2004.